UNITED STATES of America,
Plaintiff-Appellee,

v.

Frederix P. DEVEAU and Irving M.
Drobny, Defendants-Appellants.

No. 83–1655.

United States Court of Appeals,
Fifth Circuit.

May 24, 1984.

Rehearing and Rehearing En Banc
Denied July 5, 1984.

Joseph A. Turner (court-appointed), Austin, Tex., for DeVeau.

Roy Q. Minton, Austin, Tex., for Drobny.

Edward C. Prado, U.S. Atty., San Antonio, Tex., Breckinridge L. Willcox, Washington, D.C., for plaintiff-appellee.

Before RANDALL, TATE and WILLIAMS, Circuit Judges.

PER CURIAM:

Defendants-appellants Frederix DeVeau and Irving Drobny appeal their convictions for securities fraud, mail fraud, and submitting false statements to the Securities and Exchange Commission ("SEC"). Because none of the issues they raise requires reversal, we affirm.

### The Scheme

The facts essential to deciding this appeal are as follows: In 1978, DeVeau, known then as Fred Pro, entered the Department of Justice's Witness Protection Program, after serving thirty-eight months in prison for racketeering activities. He was given a new identity and was relocated in San Antonio, Texas.

In February, 1981, DeVeau acquired control of the Electric Car Company, located in Huntington Beach, California, by promising to pay the sellers with whatever profits he could generate from the company. He relocated the business in San Antonio, and operated it under the name of the Marquess Car Company. The operation was never viable and, by late 1981, it had virtually ceased operations.

In early 1982, DeVeau was introduced to the management of Jet Industries, Inc. and he began efforts to purchase the company. Jet was a publicly-held corporation located in Austin, Texas, that was engaged in the business of manufacturing electric-powered vehicles. Jet was in desperate financial trouble, despite the fact that it was cash rich. Jet had been loaned more than $2 million by the United States Department of Energy, but was losing money precipitously and was actively seeking new management. After he acquired Jet, DeVeau planned to merge it with the defunct Electric Car Company, thereby giving the latter new funds and new life, and enabling it to pay off its creditors.

During negotiations with the directors and officers of Jet, DeVeau not only concealed his past criminal record, but also misrepresented his background and financial resources. An agreement was reached between DeVeau and Jet whereby DeVeau was to acquire 20% of Jet's stock for $1,200,000, with $300,000 cash as a down payment. The agreement also provided that DeVeau would become Jet's chief executive officer after his purchase of the stock.

DeVeau had no funds and he made arrangements to borrow the $300,000 down payment from the Plaza Bank of San Antonio with the help of the bank's president, Roy Diefendorf. At the February 12, 1982 closing, Jet's representatives discovered that DeVeau had pledged Jet assets to collateralize his bank loan. DeVeau was told that such collateralization was both illegal and unacceptable to Jet, and the closing was aborted.

Negotiations continued between DeVeau and Jet's representatives, which led to a new agreement. No change was made in the purchase price, but the down payment was doubled to $600,000, and the closing was scheduled for April 8, 1982. Diefendorf arranged to secure $300,000 of the down payment through loans from some of the bank's depositors, but DeVeau was still short $300,000 of the $600,000 needed to close the deal.

Enter Drobny, a Chicago lawyer who was the beneficial owner of a large block of Electric Car Company stock. In 1981, Drobny had agreed to obtain a loan from a Chicago bank for the benefit of a friend, David Jordan. Jordan supplied Drobny with Electric Car stock to be used as collateral for the $350,000 loan. Jordan failed to make the loan payments, causing Drobny to default on the loan. By late 1981, the Electric Car stock pledged as collateral was essentially worthless. Drobny was anxious for DeVeau to acquire control of Jet and merge it with the Electric Car Company so that the Electric Car stock would regain its value, and Drobny could pay off the defaulted loan.

Drobny agreed to locate for DeVeau the remaining $300,000 needed for the down payment. Drobny obtained $300,000 from his friend and landlord, Joseph Rosin, by promising Rosin that DeVeau would pay Rosin a $30,000 "fee" for the short term use of his funds. Rosin made Drobny agree not to hand over Rosin's $300,000 check until he had a certified check for $330,000 in hand as repayment. DeVeau agreed to pay Drobny a $200,000 "fee" for raising the money from Rosin.

On April 7, 1982, Drobny traveled to Austin for the Jet closing, carrying with him Rosin's cashier's check for $300,000. On April 8, Drobny gave DeVeau Rosin's check, which was used to conclude successfully DeVeau's purchase of the Jet stock. Later that day, DeVeau tendered to Drobny a series of checks drawn on a Marquess Electric Car Company account as repayment for Rosin and as partial payment of Drobny's $200,000 "fee." DeVeau told Drobny that the checks were not good, but that he would cover them with money from a family "trust fund" that was expected to arrive in San Antonio the following day. Drobny accepted the checks in partial payment of his fee, but refused the check for Rosin, informing DeVeau that Rosin would accept repayment only by cashier's check. DeVeau agreed to give Drobny a $330,000 cashier's check from the "trust fund" the following day.

The next day, DeVeau told Drobny that the proceeds from the "trust fund" had not arrived, and Drobny returned home to Chicago. On April 11, Drobny returned to Austin for a Jet Board of Directors meeting that was scheduled for the following day. Both DeVeau and Drobny had been elected to Jet's board after DeVeau had gained control of the company. At the meeting, Drobny moved to elect DeVeau as Chairman of the Board, and DeVeau was so elected. DeVeau was still unable to produce any "trust fund" money to repay Rosin, and both DeVeau and Drobny left Austin for San Antonio.

On the morning of April 13, DeVeau went to the Plaza Bank and opened an

account with a deposit of $400,000 of Jet's monies. DeVeau then gave Diefendorf $300,000 to repay the loans that Diefendorf had arranged and repaid the bank for a long-overdue $70,000 loan.

DeVeau then left the bank, and returned later that afternoon with Drobny. When Drobny arrived at the bank, he learned that DeVeau's "trust fund" money had not arrived, despite DeVeau's representation to the contrary. Drobny also discovered that DeVeau had repaid the $300,000 Diefendorf had arranged. Drobny had not yet recovered Rosin's money, and he insisted upon buying a cashier's check from the Plaza Bank with his personal check so that he could repay Rosin. Although Diefendorf refused initially, Drobny assured Diefendorf that he was of substantial wealth, that he was a director of the Chicago bank where he maintained his account, and that his check was good—none of which was true. Diefendorf relented, and issued a $330,000 cashier's check in exchange for Drobny's check for the same amount.

Drobny returned to Chicago and gave Rosin the cashier's check. In the days that followed, Diefendorf called Drobny several times in an effort to reconfirm that Drobny's check would be good; Drobny assured him that it was, but made no efforts to cover it. Sensing that Drobny's check might not clear, Diefendorf went to DeVeau and asked him to cover the check. DeVeau gave Diefendorf a $350,000 check from Jet's monies to cover Drobny's check. When Drobny's check was returned to the Plaza Bank on April 23 for insufficient funds, Diefendorf used DeVeau's check to cover Drobny's. Drobny never inquired who covered his check, or in what fashion it was made good.[1]

During the weeks that followed, DeVeau misappropriated most of Jet's liquid assets. DeVeau paid several personal debts, repaid Electric Car's creditors, and paid Drobny $165,000 of his $200,000 fee (the checks given to Drobny by DeVeau on April 8 had bounced). By the end of May, 1982, DeVeau had managed to dissipate more than $1 million of Jet's cash. None of these expenditures were known to, or approved by, Jet's Board of Directors. No merger of Jet and Electric Car was ever considered or approved by Jet's board.

After he gained control of Jet, DeVeau signed various Form 8K Current Form Reports filed with the SEC that falsified his background and falsely stated that a large portion of the cash used to acquire Jet came from his own funds.

Jet officials began to suspect that DeVeau was using Jet assets irregularly. The scheme was soon discovered, which led eventually to this criminal prosecution.

### The Charges

A thirteen count indictment was returned against DeVeau and Drobny. Count One charged both appellants with conspiracy to commit mail fraud, securities fraud and fraud against the United States, in violation of 18 U.S.C. § 371 (1982). Counts Two through Six charged both appellants with securities fraud, in violation of 15 U.S.C. § 78j(b) (1982). Counts Seven through Ten charged DeVeau with mail fraud, in violation of 18 U.S.C. § 1341 (1982), and Counts Eleven through Thirteen charged DeVeau with submitting false statements to the SEC, in violation of 18 U.S.C. § 1001 (1982).

Before trial, the government moved for and received a dismissal of Counts Nine and Ten. Trial lasted four weeks and the jury convicted both DeVeau and Drobny on Count Two, and DeVeau on Counts Three through Seven, and Thirteen. They were acquitted of the other charges.

DeVeau was sentenced to twenty years imprisonment, and Drobny to four. This appeal followed.

---

1. Drobny's check for $330,000 was drawn on an account that never contained a balance exceeding $45,000 for the five-month period surrounding this transaction. On April 13, 1982, the day Drobny wrote the $330,000 check to the Plaza Bank, his balance was $9,769.40. After DeVeau covered Drobny's check, Drobny called Diefendorf to ask that the check be returned to him.

*DeVeau*

DeVeau's single contention is that the district court abused its discretion by refusing to grant his motion for severance when it became apparent that his defense and that of his co-defendant Drobny were "irreconcilable and mutually exclusive." DeVeau argues that his principal defense was that once he bought the Jet stock, a "de facto" merger occurred between Jet and the Electric Car Company, and that everyone knew that DeVeau's loans would have to be repaid from the sale of Electric's assets to Jet. Drobny's defense, DeVeau contends, was that a merger between Jet and Electric Car never in fact occurred, and that he thought that the money he received from DeVeau was from DeVeau's family trust. DeVeau maintains that in order for the jury to accept one of these defenses, it had to reject the other. As a result, he argues that he suffered "compelling prejudice" that warrants a new trial.

■ Persons indicted together should ordinarily be tried together. The decision whether to sever the defendants lies within the discretion of the district court. *United States v. Berkowitz*, 662 F.2d 1127, 1132 (5th Cir.1981). A trial judge's denial of severance "will not be lightly overturned, and a defendant has an extremely difficult burden of showing on appeal that the lower court's action was an abuse of discretion." *United States v. Johnson*, 478 F.2d 1129, 1131 (5th Cir.1973). In order to establish an abuse of discretion, a defendant must show that he received an unfair trial and suffered compelling prejudice against which the trial court was unable to afford protection. *United States v. Berkowitz, supra*, at 1132.

■ When co-defendants have antagonistic defenses, we have applied very specific tests to determine whether the trial was unfair. "To compel severance the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. The essence or core of the defenses must be in conflict, such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other."

*United States v. Romanello*, 726 F.2d 173, 177 (5th Cir.1984). Compelling prejudice does not arise where the conflict encompasses only minor or peripheral matters that are not at the core of the defense. *Id.*

■ We do not believe that DeVeau has fairly represented the core of each defendant's defense. Simply put, both DeVeau and Drobny maintained that Jet Industries had not been acquired in a fraudulent manner. The essence of DeVeau's defense was that his acquisition of Jet stock was done properly, and that the subsequent expenditure of Jet funds was pursuant to a "de facto" merger between Jet and the Electric Car Company. The core of Drobny's defense was that, as far as he knew, DeVeau's acquisition of the Jet stock was proper, and that he was unaware that DeVeau was using Jet monies. Thus, DeVeau and Drobny asserted that DeVeau had not used Jet funds to repay directly DeVeau's loans from the Plaza Bank's depositors and Drobny.

At trial, DeVeau contended that the repayment of his loans resulted from the sale of his Electric Car Company assets; Drobny also contended that DeVeau's loan repayments were coming from DeVeau himself, not Jet funds. The fact that Drobny alleged that he thought the funds were coming from DeVeau's "family trust" rather than DeVeau's other personal assets (such as the proceeds from the sale of his interest in the Electric Car Company), does not contradict the heart of their defenses: that they did not fraudulently use Jet's assets. The jury did not have to reject DeVeau's explanation of events to accept Drobny's.

DeVeau also avers that severance was required in this case because Drobny and his lawyer displayed such an antagnostic attitude toward him at trial that he felt he was being attacked by a "second prosecution team."

■ The taking of an adversarial stance on the part of a co-defendant's counsel may generate trial conditions so prejudicial to the defendant under multiple attack

as to deny him a fair trial. *See United v. Johnson, supra.* We have carefully examined the more than 2,000 pages of testimony given at trial and find DeVeau's claim to be exaggerated. Although DeVeau cites certain instances where Drobny's counsel emphasized that Drobny had been duped by DeVeau, and characterized DeVeau as a "great con artist," several witnesses described in great detail how DeVeau had lied to them about his background and wealth. DeVeau's counsel himself noted that DeVeau had "duped" others as part of his scheme to acquire Jet without revealing his former identity. DeVeau also complains of an instance in which Drobny's counsel interjected DeVeau's criminal record into the trial, yet DeVeau's past offenses were detailed in the indictment and were highlighted by the government in its opening argument. In sum, we do not find that the isolated instances of concerted attack that are contained in the record of this month-long trial created the compelling prejudice necessary to warrant a severance. *See, e.g., United States v. Sheikh,* 654 F.2d 1057, 1066 (5th Cir.1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982). Thus, we hold that the district court did not abuse its discretion in denying DeVeau's motion for severance.

### *Drobny*

■ Drobny raises two issues concerning his conviction on Count Two, which alleged that Drobny, in connection with DeVeau's purchase of 1,400,000 shares of Jet securities, fraudulently used Jet assets to cover the $330,000 check he wrote to the Plaza Bank. Drobny's first argument relates to the court's instruction on "willful blindness."

At trial, Drobny denied that he knew DeVeau was using Jet funds to cover the $330,000 check used to purchase the cashier's check for Rosin. The district court instructed the jury that it could find that Drobny had such knowledge if he remained "deliberately ignorant" of DeVeau's looting Jet.[2] Drobny contends that the district court failed adequately to instruct the jury that it could not infer that Drobny had knowledge of DeVeau's misdeeds merely from Drobny's negligence or recklessness regarding the transaction in question. He asserts that the court should have instructed the jury that it could find that a defendant has knowledge of a certain fact only where he or she "is aware of a high probability of its existence."[3]

Our past decisions make it clear that we do not require the inclusion of such language in a "deliberate ignorance" instruction, *see, e.g., United States v. Cook,* 586 F.2d 572, 579–80 (5th Cir.1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979), and the instruction given by the district court in this case comports with those we have approved in other cases. *Id.* at 579; *United States v. Evans,* 559 F.2d 244, 246 (5th Cir.1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978).

■ Drobny also contends that there was insufficient evidence from which a reasonable jury could have concluded that Drobny knew Jet funds were used to cover his check. A brief review of the evidence

---

**2.** The court instructed the jury that:

The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him. A finding beyond reasonable doubt of a conscious purpose to avoid enlightenment would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact. It is entirely up to you as to whether you find a deliberate closing of the eyes, and the inferences to be drawn from such evidence. A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge. Record Vol. 6 at 247.

**3.** Drobny's argument is derived from *United States v. Jewell,* 532 F.2d 697 (9th Cir.) (en banc), *cert. denied,* 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976), where the Ninth Circuit held that a deliberate ignorance instruction should state that the required knowledge is established if "the accused is aware of a high probability of the fact in question." *Id.* at 704 n. 21.

illustrates that Drobny's claim is without merit.

Testimony at trial showed that on the morning of April 13, 1982, DeVeau told Drobny that his trust fund monies had arrived; yet when the two went to the Plaza Bank that afternoon, Drobny discovered that DeVeau had lied since no such funds had materialized. That day Drobny also learned that DeVeau had just paid Diefendorf for the other $300,000 raised for the Jet closing, notwithstanding the fact that the "trust fund" was nonexistent, and DeVeau had no access to any other source of funds (other than Jet's).

 On April 16, Drobny received a telegram from Hy Federman, Jet's underwriter, which accused DeVeau of misusing Jet assets, yet Drobny repeatedly lied to Federman, telling him that Rosin had not yet been repaid—apparently in an effort to conceal DeVeau's looting of Jet. Drobny also told his stockbroker that he thought Rosin had been repaid with Jet funds, yet he never alerted anyone to the fact that Jet was being defrauded—which is consistent with the theory that DeVeau and Drobny attempted to milk Jet for all it was worth.

Instead, Drobny several times assured Diefendorf that his check was good in an effort to convince Diefendorf that Rosin's repayment would come from Drobny's own assets, not Jet's. Finally, Drobny never made any effort to cover his worthless check, and he never made any inquiry as to how his check was covered.[4]

In conclusion, we believe that there was more than sufficient evidence from which a jury could conclude that Drobny knew that DeVeau was covering his check with Jet funds. As the government points out in its brief, the only evidence concerning DeVeau's continued assertions to repay Drobny with "trust fund" money came from Drobny himself. The jury refused to credit Drobny's story and "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982) (en banc) (footnote omitted), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).[5]

**4.** Drobny argues that in order to convict him of violating 18 U.S.C. § 78j(b), the government had to prove that, at the time Drobny wrote the check, he knew that DeVeau would cover it with Jet funds. We disagree. The government had to prove only that between April 13, the date Drobny wrote the check, and April 26, the day DeVeau covered it with Jet funds, Drobny knew that DeVeau was looting Jet to cover the check. By the time the check was covered with Jet monies, Drobny had never told Diefendorf (or Jet's representatives) of DeVeau's misappropriation of Jet funds to cover Drobny's check, and thus the check, which had traveled through interstate commerce, was an integral part of the scheme that defrauded Jet. In order to satisfy section 78j(b), the fraud need only be employed in connection with the instruments of interstate commerce, *see, e.g., Gower v. Cohn*, 643 F.2d 1146, 1152 (5th Cir.1981); *Myzel v. Fields*, 386 F.2d 718, 728 (8th Cir.1967), and Drobny's subsequent lies with regard to the check fully satisfy this requirement.

Our rejection of Drobny's argument in this regard means, of course, that the jury did not have to be instructed that Drobny had to possess the necessary criminal intent at the time he wrote the check.

Drobny also argues that the jury's acquittal on Count One, the conspiracy count, demonstrates Drobny's lack of criminal intent. However, we held in *United States v. Fuiman*, 546 F.2d 1155, 1157–58 (5th Cir.), *cert. denied*, 434 U.S. 856, 98 S.Ct. 176, 54 L.Ed.2d 127 (1977), that "if a jury has convicted a defendant on one count of an indictment, and the government has adduced evidence legally sufficient to convict the defendant on that count, then whatever the jury did with the remaining counts is immaterial to appellate inquiry." *See also United States v. Espinosa-Cerpa*, 630 F.2d 328, 332 (5th Cir.1980).

**5.** There was also sufficient evidence from which the jury could have found that Drobny deliberately closed his eyes to the fact that DeVeau covered Drobny's check with Jet funds. Drobny wrote a bad check to the Plaza Bank for $330,000 knowing that DeVeau had paid off the other loans without any trust fund monies, yet Drobny never made any effort to cover the check and never asked how the check was covered, or by whom. Our holding here pretermits Drobny's argument that there was insufficient evidence from which the district court could have given the jury a willful blindness instruction.

The judgment of the district court is AFFIRMED.