**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Vincent J. BRUNO, Russell Camardelle, a/k/a "Moose," and Rodney Camardelle, Defendants-Appellants.**

No. 86–3379.

United States Court of Appeals,
Fifth Circuit.

Jan. 29, 1987.

Edward J. Castaing, Jr. (court appointed), Dymond, Crull & Castaing, New Orleans, La., for Bruno.

Dwight Doskey (court appointed), Craft & Doskey, New Orleans, La., for Camardelle.

Joseph J. Tosh, Gretna, La., for Rodney Camardelle.

Maury S. Epner, Dept. of Justice, Washington, D.C., John P. Volz, U.S. Atty., New Orleans, La., for U.S.

Before WILLIAMS, JOLLY, and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Vincent Bruno, Russell Camardelle, and Rodney Camardelle appeal from their convictions for criminal activities arising out of their involvement in a scheme to fix a criminal case. All three appellants were convicted on one count of conspiracy to commit fraud and bribery in violation of 18 U.S.C. § 371. In addition, appellants Vincent Bruno and Russell Camardelle were convicted on two counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2.

All three appellants argue that their conspiracy convictions were obtained in violation of their confrontation clause rights under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Vincent Bruno and Russell Camardelle also argue that their conspiracy convictions should be set aside because of a variance between the indictment and the evidence developed at trial. In addition, Vincent Bruno contends that the district court erroneously admitted extrinsic offense evidence at trial and denied him the right to represent himself. He also argues that he should have been granted a severance. We conclude that none of the appellants' claims is sufficient to warrant relief, and affirm their convictions.

I

The appellants were involved in a plan to fix the criminal case of Chip Langford. Chip Langford had been arrested and charged with assault and armed robbery and was imprisoned in a New Orleans jail. The scheme called for the appellant Bruno, an official in the New Orleans sheriff's office, to attempt to bribe Judge Israel Augustine, who was assigned to try Chip Langford's case.

This is the way the scheme began: on June 3, 1981, Bobby Langford contacted the codefendant Junior Provenzano and requested Provenzano's help in securing the release of his son Chip. Provenzano

agreed to help and promised to telephone Langford the next day. When Provenzano failed to call, Langford telephoned his number, but reached John Toal (an unindicted co-conspirator who testified for the government in this case), who falsely identified himself as Provenzano's son. Langford explained that Chip had been charged with assault and armed robbery and had been imprisoned, and that Provenzano had agreed to assist in securing Chip's release. Toal promised that the Langfords could visit Chip at the jail. Toal explained that fixing Chip's case would be expensive, but said that "the source we are going to is strong."

Toal later contacted Provenzano and discussed his conversation with Langford. They agreed that they would attempt to extract between $30,000 and $40,000 from Langford, calculating that such a sum would enable them to bribe the necessary person or persons, as well as to keep some fraction for themselves. They also agreed that they would not tell Langford of their intention to keep some of the money. When Toal next spoke to Langford, on the morning of June 6, he again promised that, with the help of Bruno, Langford could visit Chip at the jail. In an effort to persuade Langford that fixing Chip's case would be difficult and expensive, Toal emphasized how serious Chip's predicament appeared.

The Langfords met Toal the following day and discussed the financial situation before visiting Chip in the prison. During the visit, the Langfords met appellant Russell Camardelle (Russell) who was introduced to them as "Moose." Toal invited Russell, a guard in the prison, to join the scheme to persuade the Langfords that they could secure Chip's release, explaining that the Langfords "wanted their kid [out] of jail [and] . . . would come with a good sum of money if we could get the kid out of jail." Russell agreed to join, promising that he "would contact the detectives and also the DA's office to find out just who was handling the case." He agreed to protect Chip and to deliver packages to him that his parents sent. As the Langfords

left the jail, they gave Russell $100 for his efforts.

Toal, the Langfords, and Bruno then returned to a New Orleans hotel where they met the attorney Starr, whom the Langfords agreed to wire $500 from Alabama for a retainer. The Langfords and Toal next met Rodney Camardelle (Rodney), Russell's brother, at a local restaurant. Because Russell was often difficult to contact, Rodney agreed to serve as a conduit between his brother and Toal.

Three days later, Rodney telephoned Toal to report that Russell had discussed Chip's case with investigators from the district attorney's office and said that there was a "good inside shot that [Chip] might go and he won't do any time." Accordingly, Rodney advised Starr that he should not under any circumstances attempt to contact the district attorney and "rock the boat"; he should merely file an appearance and maintain a low profile.

On June 13, Langford telephoned Toal, who described the group's progress in securing Chip's release. He reported that Russell had made contacts in the district attorney's office, was visiting Chip two or three times a day, and had taken Chip the packages his parents had sent, packages that prisoners were not ordinarily entitled to receive. Langford remarked that "that $100 did something to Moose." Toal also told Langford that Starr, the attorney they had retained, was preparing for a hearing the following week. Finally, Toal assured Langford that Chip was "gonna walk."

While preparing for the hearing, Starr sought to arrange bail for Chip, but was advised by Toal and Bruno that "under no means [to] work out where [Chip] could get out on bond." Because Chip and his parents were "carnival people," Toal and Bruno thought Chip would jump bail, which would result in their receiving no payment from the Langfords.

By June 17, Toal and Provenzano concluded that the Langfords would be unable to raise the $30,000 or more necessary to bribe either the judge or the local prosecu-

tors. Thus, although they did not give up hope of the fix, they decided to tell the Langfords that Chip's case could be fixed if they were paid $10,000 within the next nine days. Toal advised Langford that the people fixing Chip's case wanted "half up front and when the boy's out . . . they want the other half." Toal "guarantee[d]" that the $10,000 payment would secure Chip's release, and he assured Langford that Provenzano would "do anything in the world for you. In fact, he's not making a nickel on this thing. He's doing it because . . . he don't like to see nobody in a humbug."

Thereafter Toal informed Bruno that Langford would pay them $10,000 and that they would split the money. He also told Rodney that they would soon collect, and he contacted both Starr and Russell and asked whether they would be able to secure Chip's release if paid a sufficient sum.

The next day, June 19, Toal telephoned the Langfords to tell them, falsely, that Provenzano was in the final stages of fixing Chip's case, and that he needed to "get them to go ahead and make a commitment on the money." The Langfords then confirmed that Provenzano would be paid $5,000 before the release and an additional $5,000 following it.

Four days later, when Langford telephoned Toal to tell him that he had collected $5,000, Toal instructed him to put the money in large bills in an envelope and meet him in a Mobile, Alabama, hotel. That evening, June 23, Toal, Provenzano, and an assistant named John Rietzke, met with the Langfords in the bar of a Mobile, Alabama hotel. After the Langfords' arrival, Provenzano dismissed Toal and Rietzke. Provenzano promised the Langfords to obtain Chip's release within five days or to refund the $5,000 if Chip were not released. Provenzano and the Langfords then went to Langford's truck in the parking lot where Langford gave Provenzano an envelope containing $5,000 in $100 bills. Provenzano, Toal and Rietzke left for New Orleans; en route Provenzano gave Toal $2,000, explaining that he would give $1,000 from the remainder to Starr.

Two days later, Langford telephoned Rodney and Toal to warn them that he had been questioned extensively by the FBI the preceding day. Langford asked Toal how he should explain to the authorities his meeting with Provenzano in the hotel in Mobile and his having recently borrowed a large sum of money. Privately, Toal welcomed the FBI involvement, because if the group could not secure Chip's release, they could blame their failure on the FBI. At trial he testified: "So we got the $5,000 and a good excuse for not doing anything for Chip Langford."

In the weeks that followed, Toal maintained contact with Bruno, Rodney, Russell, and Starr in an effort to secure Chip's release, or, at least obtain a commitment from the authorities for a short sentence. On July 8, he telephoned Rodney and learned that Russell's efforts to fix the case through the district attorney's office had thus far been unsuccessful and that "it look[ed] bad" for Chip. On July 10, he spoke with Bruno to update him on the progress of Chip's case and how "Starr should handle the case." Four days later, Toal asked Bruno to arrange for the Langfords admission to the prison to visit Chip. On July 12, the day before a hearing in Chips' case, Toal and Provenzano met with Starr and paid him $1,000. On July 20, Toal paid Russell another $100 for visiting Chip at Toal's request. In the end, however, Chip pleaded guilty and was sentenced to five years' imprisonment.

On or about October 21, 1981, an FBI agent approached Michael Starr and confronted him with the information that had been obtained concerning the fix-scheme and Starr's involvement in it. Starr agreed to cooperate.

In April 1982, Toal began a term of imprisonment for possession of a firearm as a felon. While in prison, he was asked by the FBI to cooperate in giving information concerning Provenzano's illegal activities and in providing tape recordings of Provenzano and others. Toal agreed to cooperate.

On January 21, 1986, a six-count indictment was returned against Vincent Bruno,

Junior Provenzano, Russell Camardelle, a/k/a "Moose," and his brother, Rodney Camardelle, alleging criminal conspiracy (18 U.S.C. § 371); wire fraud (18 U.S.C. § 1343) and interstate travel in aid of racketeering or ITAR (18 U.S.C. § 1952). Count 1 alleged a conspiracy by the defendants to commit two offenses: wire fraud in defrauding the Langfords, consisting of false promises to fix their son's case by bribing the presiding judge and other public officials, and the receipt of payment from the Langfords for the scheme, *and* using interstate commerce to commit an actual act of bribery of these public officials.

Counts 2, 3, and 4 alleged acts of wire fraud for the purpose of furthering fraud, and counts 5 and 6 alleged interstate acts in aid of racketeering for the actual bribery.

Trial was held from March 17, through 25, 1986. The jury found Vincent Bruno and Russell Camardelle guilty on counts 1 (conspiracy), 3 (wire fraud) and 4 (wire fraud); but acquitted them on count 2 (wire fraud) and counts 5 and 6, both involving the actual acts of bribery. Rodney Camardelle was found guilty on count 1, but was acquitted on all other counts. Provenzano was found guilty on all counts except count 5.

The appellants received light sentences. Bruno was sentenced to eighteen months' imprisonment, fined $3,000, and given concurrent three-year terms of probation on each count. Russell Camardelle was sentenced to three years' imprisonment on the conspiracy count, all but six months of which was suspended, two suspended sentences of imprisonment on the wire fraud counts, and concurrent three-year terms of probation on each count. Rodney Camardelle, convicted only on the conspiracy count, was sentenced to a suspended three-year term and placed on probation for that period. Vincent Bruno, Russell Camardelle and Rodney Camardelle now appeal their convictions.

## II

Just after the jury was sworn in, counsel for codefendant Provenzano announced in the presence of the jury that his client wished to plead guilty to count 1, the conspiracy count. Following the plea, taken outside the jury's presence, the court instructed the jury that Provenzano had pleaded guilty to count 1, but that his action should have no bearing on the guilt of the other defendants. All three appellants argue that under the principles of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), Provenzano's announcement violated their rights under the confrontation clause of the sixth amendment, and that the district court's subsequent limiting instruction did not cure the violation. We disagree.

In *Bruton,* the Supreme Court held that the admission in a joint trial of a codefendant's extrajudicial confession incriminating the defendant violates the defendant's right to confrontation when the codefendant does not testify at trial. *Id.* at 126, 88 S.Ct. at 1622. The appellants' argument that Provenzano's guilty plea harmed their defense has some strength. Conspiracy is not a crime that is performed by a single person, and a natural inference from Provenzano's plea was that at least one or more of his conspiracy codefendants was also culpable. However, this court has consistently held that the *Bruton* rule is not violated unless a codefendant's statement *directly* alludes to the complaining defendant. *United States v. Webster,* 734 F.2d 1048, 1054 n. 6 (5th Cir.1984); *United States v. Heffington,* 682 F.2d 1075, 1082–83 (5th Cir.1982). In this case, Provenzano's guilty plea does not directly implicate any specific appellant directly; furthermore, there were other, unindicted co-conspirators in this case, including the government witnesses John Toal and Michael Starr with whom Provenzano could have conspired. We must therefore reject the appellants' *Bruton* claim.

## III

Bruno argues that he should have been granted a severance under Fed.R.

Crim.P. 14 because his defense was antagonistic to Provenzano's after Provenzano pled guilty to conspiracy. The test for severance because of antagonistic defenses is "the essence or core of the defenses must be in conflict such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other." *United States v. Lee*, 744 F.2d 1124, 1126 (5th Cir.1984); *United States v. Romanello*, 726 F.2d 173, 177 (5th Cir. 1984). Defendants may disagree on the facts not comprising the core of their defenses without generating the kind of prejudice that mandates severance. *United States v. Lee*, 744 F.2d at 1126; *United States v. DeVeau*, 734 F.2d 1023, 1027 (5th Cir.1984).

■ In this case Bruno's trial defense was based upon his contention that he was not a member of a conspiracy, while Provenzano's defense acknowledged that there was a conspiracy, *but that only Provenzano and Toal were members.* The defenses are not then mutually exclusive since it would be possible to believe that Provenzano was involved in a conspiracy, while also believing that Bruno was not a member.

## IV

Vincent Bruno and Russell Camardelle argue that their convictions on count 1, the conspiracy count, should be set aside because prejudicial variance existed between what was alleged in the indictment and what was actually proved at trial. Count 1 of the government's indictment alleged that the defendants conspired both to bribe officials to fix Chip Langford's criminal case *and* to defraud the Langfords. Bruno and Camardelle argue that a variance existed because the government failed to present any evidence at trial showing that they intended to defraud the Langfords. While we agree with Bruno and Camardelle that the government failed to present sufficient evidence to sustain a jury finding that they conspired to defraud the Langfords, we do not regard this variance as requiring reversal of their convictions for conspiracy.

■ A variance arises when the evidence adduced at trial establishes facts different from those alleged in the indictment. *Dunn v. United States*, 442 U.S. 100, 105, 99 S.Ct. 2190, 2193, 60 L.Ed.2d 743 (1979). The existence of a variance *per se*, however, does not mean that the conviction must be reversed. In order for a variance to warrant reversal, it must affect the substantial rights of the accused. *Kotteakos v. United States*, 328 U.S. 750, 756, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946); *United States v. Fischbach and Moore, Inc.*, 750 F.2d 1183, 1189 (5th Cir.1984); *United States v. Sheikh*, 654 F.2d 1057, 1066 (5th Cir.1981).

We agree with Bruno and Camardelle that a variance exists in this case. The evidence the government was presented at trial is simply insufficient to sustain a jury finding that Bruno and Camardelle were guilty of conspiring to defraud the Langfords. Although we view the evidence in the light most favorable to the government in this case, we can find no proof of any intent on the part of either Bruno or Camardelle to defraud the Langfords. At most, the government's evidence shows that Bruno and Camardelle were anxious to get paid for their services and that they viewed Chip Langford's welfare as considerably less important than the objective of their getting paid. Furthermore, on direct examination at trial, the government's star witness, John Toal, testified that Bruno and Camardelle were never informed of Toal's and Provenzano's intent to keep the money even if Chip Langford's case could not be fixed, and the government's trial attorney conceded this point during closing argument. There was therefore no evidence at trial to show that Bruno and Camardelle intended to defraud the Langfords by making false claims or by failing to go ahead with the plan to fix. We therefore agree that a variance exists between the conspiracy count of the indictment and the proof offered at trial.

■ Nevertheless, we are satisfied that this variance was not prejudicial. The indictment charged Bruno and Camardelle

with conspiring to commit the offenses of bribery and fraud, when in fact it proved only that they conspired to commit bribery. Yet the government need not prove conspiracy to commit multiple offenses in order to gain a conviction on a conspiracy count. Conspiracy to commit a single criminal offense is all that is required to prove a violation of 18 U.S.C. § 371. It is not necessary for the government to prove all the charges contained in the indictment; it need prove only a sufficient number of charges in each count so as to make out a violation of the statute relied upon. *United States v. Georgalis*, 631 F.2d 1199, 1205 (5th Cir.1980); *Myrick v. United States*, 332 F.2d 279, 281 (5th Cir.1963), *cert. denied*, 377 U.S. 952, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964).

■ Our review of the record convinces us that the evidence was more than sufficient to support a finding that Bruno and Camardelle were guilty of conspiring to bribe and no serious argument can be made to the contrary. We therefore conclude that the variance between the conspiracy count and the proof at trial was not prejudicial since the evidence was sufficient to sustain a conviction for conspiracy to commit an illegal act.

## V

Vincent Bruno and Russell Camardelle argue that their wire fraud convictions must be reversed because the evidence at trial failed to establish that they had fraudulent intent in dealing with the Langfords.

The essential elements of wire fraud, 18 U.S.C. § 1343, are (1) a scheme to defraud, and (2) the use of interstate communications in furtherance of the scheme. *United States v. Gordon*, 780 F.2d 1165, 1171 (5th Cir.1986); *United States v. Cowart*, 595 F.2d 1023, 1031 n. 10 (5th Cir.1979). Bruno and Russell Camardelle argue that since the evidence at trial failed to show that they intended to defraud the Langfords, they had no participation in a fraudulent scheme and therefore could not be convicted of wire fraud. This argument presupposes that the scheme to defraud the

Langfords was the only fraudulent scheme alleged in the wire fraud counts. In fact, the wire fraud counts charge Bruno and Camardelle with another fraudulent scheme: a scheme to defraud the citizens of Orleans Parish of the honest services of public officers, specifically the honest services of Bruno and Russell Camardelle, of the judge whom they planned to bribe, and of representatives of the district attorney's office.

As discussed earlier, we agree with Bruno and Camardelle that the evidence at trial could not establish that they intended to defraud the Langfords. However, as we noted earlier in connection with the variance issue, it is not necessary for the government to prove all of the allegations in an indictment count; it need prove only enough allegations to establish a violation of the statute on which the count relies. *See United States v. Georgalis*, 631 F.2d at 1205. Therefore, the relevant issue before this court is whether Bruno and Camardelle could properly be charged and found guilty of a scheme to defraud the citizens of Orleans Parish.

As we understand it, this alleged scheme to defraud the local citizens is nothing more than an artful way of pleading the bribery scheme that the defendants were charged with in count 1 of the indictment. Since we concluded earlier that the evidence was more than sufficient to sustain the convictions of Bruno and Russell Camardelle for conspiracy to bribe, our inquiry is focused on a purely legal question: whether a scheme to bribe a public officer can satisfy the fraudulent-scheme requirement for a conviction of wire fraud under 18 U.S.C. § 1343. We believe that it can.

Authority for our reading of the wire fraud statute can be found in decisions involving the mail fraud statute, 18 U.S.C. § 1341. Because the requisite elements of "scheme to defraud" under the wire fraud statute, 18 U.S.C. § 1343 and the mail fraud statute are identical, cases construing mail fraud apply to the wire fraud statute as well. *United States v. Lemire,*

720 F.2d 1327, 1334–35 n. 6 (D.C.Cir.1983); *United States v. Feldman*, 711 F.2d 758, 763 n. 1 (7th Cir.1983).

In *Shushan v. United States*, 117 F.2d 110 (5th Cir.1941), this court held that a scheme to bribe public officials could constitute a scheme to defraud for purposes of mail fraud:

> But there may be a scheme to defraud by other means than by express false representations.... A scheme to get a public contract on more favorable terms than would be likely to be got otherwise by bribing a public official would not only be a plan to commit the crime of bribery, but would also be a scheme to defraud the public.... No trustee has more sacred duties than a public official and any scheme to obtain an unfair advantage by corrupting such an one must in the federal law be considered a scheme to defraud.

117 F.2d at 115.

The Seventh Circuit relied on our *Shushan* decision in *United States v. Isaacs*, 493 F.2d 1124 (7th Cir.1974). In *Isaacs*, the Seventh Circuit concluded that former Illinois governor Otto Kerner, who had been charged with accepting bribes, had also been properly convicted of wire fraud on the theory that the citizens of Illinois had been defrauded of Kerner's honest and faithful services as governor. 493 F.2d at 1150. The Seventh Circuit recently reiterated this reading of the mail fraud statute in *United States v. Murphy*, 768 F.2d 1518 (7th Cir.1985).

Similarly, in *United States v. Curry*, 681 F.2d 406 (5th Cir.1982), this court held that a scheme to defraud under the mail fraud statute could be defined broadly so as to include a theory that members of a political action committee were "defrauded" by the committee's chairman when he misappropriated funds of the committee, even though they had no proprietary interest in the funds. 681 F.2d at 411. This court held that the members were defrauded because, when he misappropriated the funds, the chairman defrauded them of the right to his honest and faithful service that he owed to them. *Id.*

Finally, we turn to a decision of this court involving the wire fraud statute itself. Although the issue of bribery as fraud was not directly raised in *United States v. Pecora*, 693 F.2d 421 (5th Cir. 1982), this court affirmed wire fraud convictions in that case where the relevant scheme was a scheme to bribe local officials in a criminal case. In *Pecora*, defendants Frances Pecora and her son Nofio Pecoraro were charged with taking part in a scheme to bribe a Louisiana sheriff and district attorney in order to assure that Pecoraro, who was in custody, would not be convicted on drug charges. The government charged the defendants with wire fraud under 18 U.S.C. § 1343, alleging that Frances Pecora made a telephone call for the purpose of executing the bribery scheme. The facts in *Pecora* thus closely parallel the facts in this case, and the court affirmed the wire fraud convictions.

Of course, the appellants, who do not discuss *Pecora*, could argue that the case does not support the conclusion that a scheme to bribe may constitute a scheme to defraud, since the issue was not specifically raised in the court's opinion. It is also possible, however, that the court did not raise the issue because it accepted the issue to have been well settled by *Shushan v. United States*, 117 F.2d 110. In any event, it is clear under our precedent that one may be defrauded of nonpecuniary interests. Of course, no one contests that the citizens of Orleans Parish possess the right to the honest services of its public officials.

█ We therefore conclude that under the wire fraud statute, 18 U.S.C. § 1343, a scheme to defraud may include a scheme to bribe public officials, on the theory that the citizens are defrauded by such a scheme.[1]

---

**1.** Our conclusion is not without reservations over the broad definition that has been given to "scheme to defraud." We believe that an interpretation of the statutory term "defraud" that includes deprivation of the public's right to the honest and faithful services of its officials reaches the outer limits of meaning that can be placed on the word "defraud." This is espe-

Since, as we discussed earlier, we find that there is adequate evidence to support the jury's finding that Vincent Bruno and Russell Camardelle conspired to bribe, we reject their contentions that the government failed to show that they took part in a scheme to defraud for purposes of wire fraud.

## VI

Vincent Bruno argues that the district court erroneously admitted extrinsic evidence against him at trial, in violation of Fed.R.Evid. 404(b) and Fed.R.Evid. 403. Bruno claims that the district court erred in this respect when at trial it allowed the entry of evidence of prior bribery involvement on Bruno's part, and when it allowed the playing of a tape recording of Bruno admitting to indulging in various personal activities, such as playing cards and playing golf, during working hours, thereby violating Louisiana law.

■■■■  Fed.R.Evid. 404(b) allows the introduction of evidence of prior crimes when such evidence is not used to show bad character. Such evidence must also meet the general requirement of Fed.R.Evid. 403 that the probative value of the evidence outweighs any risk of undue prejudice. Although these restrictive rules are to be applied faithfully by district courts, the standard of review on appeal is deferential. A decision by the trial judge to admit extrinsic offense evidence will not be disturbed absent a clear showing of abuse of discretion. *United States v. Barron,* 707 F.2d 125, 128 (5th Cir.1983); *United States v. Emery,* 682 F.2d 493, 497 (5th Cir.1982). During direct examination, the government elicited testimony from its witness John Toal, stating that Bruno had been involved in earlier bribery schemes. We are not persuaded that the district court abused its discretion by allowing in this evidence of prior bribery involvement. Both parties admit that this evidence was probative of Bruno's intent which Bruno had clearly put in issue. Furthermore, the district court limited use of this evidence, thus reducing the likelihood of any undue prejudice.

■■■■  Although the section of the tape recording pertaining to Bruno's extracurricular activities at work was irrelevant to any issue at trial, any error made in its admission was harmless beyond a reasonable doubt, since the admitted evidence was innocuous and added nothing to the government's case.

## VII

In his supplemental brief[2] Vincent Bruno contends that the district court denied him the right to represent himself. This claim is without merit. While under the sixth amendment a defendant is guaranteed the right to defend himself, *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), this right must be exercised through a knowing and intelligent waiver of the right to counsel. *Id.* at 835, 95 S.Ct. at 2541. Bruno did not effectively waive his right to counsel.

■■■■  The supplemental record shows that prior to trial Bruno's first appointed counsel withdrew at Bruno's request because he wanted to represent himself. But Bruno eventually agreed to have his cur-

cially true when it is considered that the term includes an element of intent.

Here, however, there can be no doubt that the defendants in this case knew that the public officials whom they attempted to bribe owed honest service to the citizens of Orleans Parish. Furthermore, there can be no doubt, from the record in this case, that the defendants intended to deprive the citizens of Orleans Parish of the honest services of these officials. Thus, although the appellants may never have thought of their scheme in the grandiose terms of defrauding the entire electorate of Orleans Parish, it is nevertheless clear that they possessed the necessary intent to bribe public officials and thereby defraud the public. This court is bound by its prior holding in *Shushan v. United States,* 117 F.2d 110 (5th Cir.1941) that a scheme such as this one that defrauds the public satisfies the statutory requirements of 18 U.S.C. § 1343.

2. The earlier arguments made in support of reversing Bruno's convictions were raised in the brief of Mr. Bruno's second appointed attorney. This court granted Mr. Bruno leave to file a supplemental pro se brief.

rent appointed counsel represent him at trial and did not seek to remove him at any point during the trial. It is thus clear that Bruno's right to represent himself was waived.

Bruno's pro se supplemental brief raises several other grounds either for reversing his convictions or for reducing his sentence. These grounds are, however, all utterly without merit.[3]

## VIII

For the reasons discussed earlier in this opinion, the convictions of the appellants Vincent Bruno, Russell Camardelle and Rodney Camardelle are

AFFIRMED.

---

**3.** In his pro se brief, Bruno appears to argue the following as grounds for reversing his conviction: (1) that he is entitled to a new trial because of newly discovered evidence; (2) that insufficient evidence supported the grand jury indictment; and (3) that he was the victim of vindictive prosecution. Bruno also argues that his sentence should be reduced because it lacked parity with the sentence given to Russell Camardelle.