**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Lee G. LOVETT, Defendant-Appellant.**

**No. 85–2967.**

United States Court of Appeals,
Seventh Circuit.

Argued May 6, 1986.

Decided Jan. 26, 1987.

As Corrected Feb. 6, 1987.

Steven A. Miller, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., U.S. Atty's. Office, Chicago, Ill., for defendant-appellant.

Larry S. Gondelman, Hundley & Cacheris, P.C., Washington, D.C., for plaintiff-appellee.

Before CUDAHY and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

The defendant, Lee G. Lovett, appeals his conviction for mail fraud violations and the order of the district court requiring him to pay restitution. We affirm the conviction, vacate the order of restitution and remand.

## I

In the spring of 1980, the Village of Fox Lake, Illinois ("Fox Lake"), a community with a population of approximately 6,000 citizens, sought to award a cable television franchise. As a result of the awarding of the cable television franchise, after an investigation, the defendant, Lee G. Lovett was indicted by a grand jury on April 29, 1985, and charged with violations of Title 18, United States Code, Sections 371, 1952(a)(3) and 1341 arising from the alleged bribery of the mayor of Fox Lake, Illinois in an attempt to ensure that the cable television franchise be awarded to his client, U.S. Cable. Count one of the indictment charged the defendant Lovett with conspiring to violate the Travel Act by travelling in interstate commerce to promote bribery under the laws of the State of Illinois (18 U.S.C. § 371). Counts two, three and four alleged substantive violations of the Travel Act (18 U.S.C. § 1952(a)(3)) involving the promotion of bribery. Counts five and six charged the defendant with mail fraud (18 U.S.C. § 1341).

The Village of Fox Lake is governed by a board of six trustees and a mayor. The trustees, under the authority of the village charter, vote to award all contracts. The mayor casts a vote only to break a tie vote.

In 1980, the defendant, Lee G. Lovett, was a partner in a Washington, D.C. law firm specializing in communications law. Richard "Butch" Hamm was the mayor of the Village of Fox Lake, Illinois. Richard Gerretsen was a Fox Lake village trustee who served as the board's "whip." Kurtis Borre was a personal friend of Mayor Hamm's and a local accountant.

In the spring of 1980, the village trustees decided to explore the awarding of a cable television franchise covering the Village of Fox Lake, Illinois. Mayor Hamm appointed Jean Berdnick, a trustee of the Board, to serve as the chairperson of a cable tele-

vision commission created by the Village Board to be responsible for the evaluation of the cable presentations.

Five cable television companies, including U.S. Cable of Hackensack, New Jersey, showed an interest in obtaining the Fox Lake cable franchise.[1] Lovett and his law firm received a $100,000 fee from U.S. Cable to assist U.S. Cable in obtaining the Fox Lake franchise as well as other new franchises and to attempt to reverse the previous award of cable franchises for Libertyville and Mundelein.[2] In addition to the $100,000 retainer, Lovett and his firm were to receive a victory bonus of $7.50 for each home located within a municipality where he successfully obtained the franchise rights.[3]

The parties agree that in April of 1980, Joe Patrovsky, a local resident, arranged a dinner engagement where the defendant Lovett and Mayor Hamm were introduced. According to testimony offered at trial, the purpose of the dinner, which took place on April 18, 1980, was to have Lovett meet Mayor Hamm. According to trial testimony, at the end of the evening, Lovett asked the mayor if he could call him to arrange a meeting to discuss U.S. Cable.

At this point, the parties disagree as to the number of private meetings between the defendant and Mayor Hamm after the initial dinner meeting and what was said at the meetings. Mayor Hamm testified that Lovett called him and arranged a private meeting at a restaurant prior to the cable companies' April 21st presentation. Mayor Hamm testified in essence that, at this private meeting, Lovett mentioned that there was the possibility that he (the May-

or) would be rewarded with a 5% interest in the local subsidiary of U.S. Cable. Mayor Hamm testified that, at the conclusion of his meeting with the defendant, he immediately called his friend Richard Gerretsen and invited him to his office and said, "I believe I've just been hit with a bribe from U.S. Cable." Gerretsen advised him to follow up on it. Mayor Hamm and Gerretsen had, in the past, split bribes from individuals receiving Village contracts, licenses, and business. At trial, Mayor Hamm hedged on his previous statement to Gerretsen and testified at that point he "wasn't too sure" that a bribe had been offered.

At a public meeting held on April 21, 1980, three competitors for the municipality's cable contract, including U.S. Cable (represented by the defendant Lovett) made presentations. Mayor Hamm was not present. Mrs. Berdnick and another village trustee attended the meeting, and each testified at trial that there was no mention at the meeting of a local ownership interest by anyone.

The parties are in agreement that on or before May 2, 1980, Lovett called Mayor Hamm to arrange a private meeting.[4] Mayor Hamm testified that he inquired at this meeting what 5% in the local subsidiary would be worth and was told that in five to seven years it would be worth $250,000. Hamm testified that he then advised Lovett that it would be illegal for him to hold the interest in his own name. Hamm further testified that Lovett suggested that he (Hamm) select a nominee who would hold the interest for him and that the mayor should advise Lovett's office of the

---

1. The Northwest Lake County, Illinois area, of which Fox Lake was a part, offered a potential cable subscriber base of 90,000 homes which could produce estimated annual revenues of between $6–$9,000,000 and have a market value of $30–$45,000,000.

2. Failure to obtain franchises in adjoining areas jeopardized U.S. Cable's chances of obtaining the Fox Lake franchise.

3. Obtaining the Fox Lake franchise and its approximately 1,600 homes (multiplied by $7.50 for each home located in the municipality

whether each home signed on for cable service or not) was worth an additional $12,000 to Lovett's firm. Testimony was offered that since the Northwest Lake County area contained approximately 90,000 residences, the potential victory bonus to the defendant's law firm was in the area of $675,000.

4. Mayor Hamm testified this was their second private meeting between them. On the other hand, the defendant Lovett testified this was the first and only private meeting.

name of his nominee. The defendant Lovett gave the mayor a business card listing his Washington, D.C. telephone number and his secretary's name. The business card, which was introduced as an exhibit at trial, contained handwritten notations made by Mayor Hamm during the May 2, 1980, meeting which included the figure "$250,-000" and "5%." Mayor Hamm testified that after meeting with the defendant Lovett, he once again met with Gerretsen and told Gerretsen that U.S. Cable had offered him a 5% bribe.[5] Hamm explained the bribe to Gerretsen and the need for a nominee, and suggested that Borre, the mayor's close personal friend, act as the nominee. The 5% interest would be divided among himself (2%), Gerretsen (2%) and Borre (1%). Gerretsen's percentage was in exchange for his influencing the votes on the Village Board.[6]

Lovett denied offering a bribe to Mayor Hamm. According to his testimony, he called Mayor Hamm after the presentation to the Board on April 21st and met with him alone on only one occasion, that being May 2nd. At this meeting, Lovett testified, that he and the mayor discussed U.S. Cable, the Fox Lake franchise, and the concept of local ownership and U.S. Cable's desire to offer a percentage of a subsidiary company to a local owner. Lovett in his testimony contradicted the testimony of Hamm's and Borre's stating that he had no knowledge of the agreement between Borre and the mayor concerning Borre's acting on the mayor's behalf.

Shortly after the May 2nd meeting, Mayor Hamm testified that he met with Borre and explained the payoff scheme and told him that he would be contacted by Lovett.

Testimony was offered that the defendant called Borre and arranged to meet him on May 15, 1980. On that date, Hamm and Borre went to the Sheraton Hotel in Waukegan, Illinois, to meet with Lovett. After Borre and Lovett were introduced to each other by Mayor Hamm, Borre testified that Lovett asked Hamm, "So this is the man you trust?" Lovett and Borre discussed U.S. Cable and the need for local owners. Borre testified that Lovett told him that local politicians were legally prohibited from receiving partnership interests and that Borre's name would be disclosed as a local owner to the Federal Communications Commission.

Soon thereafter, in July of 1980, Borre received two letters from U.S. Cable outlining and confirming the terms of his interest in the local cable company. One letter dated July 22, 1980, required Borre to disclose to U.S. Cable the names of any person with whom he intended to share his interest. These two letters formed the basis of the mail fraud counts under 18 U.S.C. § 1341 against the defendant.

On January 19, 1981, the Fox Lake, Illinois council voted six to zero to award the cable television franchise to U.S. Cable. Soon after this decision, Borre testified that he paid $100 in cash to the defendant Lovett as his contribution toward the privilege of gaining a 5% interest in the local subsidiary of U.S. Cable. Subsequently, U.S. Cable assigned 5% of its interest in its Northwest Lake County subsidiary to Borre.[7]

Following a jury trial, the defendant Lovett was convicted of the mail fraud alleged in counts five and six of the indictment. Lovett was sentenced to three

5. We note that at trial the president of U.S. Cable, Stephen Myers, testified that Lovett was not authorized to offer ownership interests to local politicians.

6. Gerretsen and Hamm testified that Gerretsen controlled at least two votes in addition to his own, thus ensuring at least a three-three vote on any cable franchising decision.

7. Stephen Myers, a partner in U.S. Cable in 1980 and at the time of trial, testified that U.S. Cable

Corporation of Hackensack, New Jersey was the management company for U.S. Cable of Lake County. He testified further that U.S. Cable of Northwest Lake County was an affiliate partnership of U.S. Cable of Lake County, Illinois for the purpose of securing franchises in Lake County. Myers also testified that the target communities for U.S. Cable of Northwest Lake County were Fox Lake, Antioch, Lake Villa, Illinois, and some unincorporated portions of the county that surrounded those three municipalities.

months imprisonment on count five of the indictment, a consecutive five year period of probation on count six, and, as a condition of his probation, ordered to pay restitution of $150,000 to the Village of Fox Lake, Illinois.[8]

The defendant appeals the jury's verdict and the judge's order of restitution. He raises three issues on appeal:

(1) Was there sufficient evidence to uphold the mail fraud conviction?

(2) Was the mail fraud scheme fatally at variance with the scheme alleged in the indictment?

(3) Was the district court's probation order regarding the payment of restitution through the United States Probation Department to the citizens of Fox Lake lawful and proper?

## II

The defendant argues that the evidence presented at trial failed to establish a criminal fraud within the meaning of the mail fraud statute, 18 U.S.C. § 1341.[9] In reviewing the district court's decision, we are cognizant of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) in which the Supreme Court stated:

"[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.... This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law."

443 U.S. at 319, 99 S.Ct. at 2789 (citation omitted) (emphasis in original).

The mail fraud statute, first promulgated in 1872,[10] has been a powerful prosecutorial tool.[11] The objective of the mail fraud statute is to safeguard the United States Postal Services from being used to effect schemes to defraud. *Parr v. United States*, 363 U.S. 370, 389, 80 S.Ct. 1171, 1182, 4 L.Ed.2d 1277 (1960). The statute seeks to prevent fraudulent conduct regardless of whether or not there is any loss or damage to the victims of the crime. *United States v. Bush*, 522 F.2d 641, 648 (7th Cir.1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976).

The required elements for a section 18 U.S.C. § 1341 violation are two: (1) a scheme to defraud, and (2) the use of the

**8.** Mayor Hamm, Gerretsen, and Borre were also charged in the indictment. Each entered guilty pleas to various counts arising from the bribery scheme.

**9.** Title 18 U.S.C. 1341 provides:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any

matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

**10.** Ch. 335, § 301, 17 Stat. 323.

**11.** Several commentators have noted prosecutors' extensive use of the mail fraud statute. *See, e.g.,* Morano, *The Mail-Fraud Statute: A Procrustean Bed*, 14 J. Marshall L.Rev. 45 (1980); Rakoff, *The Federal Mail Fraud Statute*, 18 Duq.L.Rev. 771 (1980).

U.S. mails in furtherance of that scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *United States v. Keane*, 522 F.2d 534, 544 (7th Cir.1975) *cert. denied*, 474 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976). In *Keane*, 522 F.2d at 545, this court noted: "Neither the ultimate success of the fraud nor the actual defrauding of a victim is crucial to a successful prosecution."

The mail fraud statute has been employed with success in combatting political corruption. *See United States v. Mandel*, 591 F.2d 1347 (4th Cir), *conviction aff'd in relevant part on rehearing en banc*, 602 F.2d 653 (4th Cir.1979) (per curiam), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980); *United States v. Brown*, 540 F.2d 364 (8th Cir.1976); *United States v. Keane*, 522 F.2d 534 (7th Cir. 1975), *cert. denied*, 414 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); *United States v. Isaacs*, 493 F.2d 1124 (7th Cir.), *cert. denied* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974). The instant case involves corruption of the political process even though the defendant in this case is not a politician.

The case was tried to a jury on an "intangible rights" theory [12] basically alleging that the defendant intended to deprive the citizens of Fox Lake of their rights to good government and to the honest and loyal services of public officials, specifically Mayor Hamm.[13] This court previously addressed this issue in *United States v. Alexander*, 741 F.2d 962 (7th Cir.1984):

"A scheme to defraud the citizenry and government of an intangible right, such as honest service, can be contrasted with a scheme to obtain tangible property through fraud. A scheme to obtain tangible property is cognizable under the mail fraud statute regardless of the relationship between the defendant and his victim. In contrast, an intangible rights scheme is only cognizable when at least one of the schemers has a fiduciary relationship with the defrauded person or entity. * * * There can be no doubt that a nonfiduciary who schemes with a fiduciary to deprive the victim of intangible rights is subject to prosecution under the mail fraud statute."

741 F.2d at 964.

The defendant argues that no evidence was presented to the jury establishing that Mayor Hamm had actually failed to carry out his duties and responsibilities as the mayor of Fox Lake, Illinois, thus Fox Lake suffered no loss of any rights—tangible or intangible. The defendant relies on *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct.

**12.** At least one commentator has extensively discussed the "intangible rights" theory of prosecution. *See* Comment, *The Intangible-Rights Doctrine and Political-Corruption Prosecutions Under the Federal Mail Fraud Statute*, 47 U.Chi.L. Rev. 562 (1980).

**13.** The indictment of the defendant provided in part (paragraph two of Count five):

"Beginning in or about April 1980 and continuing until the date of this indictment, at Fox Lake, in the Northern District of Illinois, Eastern Division and elsewhere, LEE G. LOVETT and KURTIS BORRE, defendants herein, together with co-schemer, Richard Hamm devised and intented [sic] to devise and participate in a scheme to defraud (a) the Village of Fox Lake and its citizens of their right to the legal, faithful and honest services of Richard Hamm in the performance of acts related to his public employment; (b) the Village of Fox Lake and its citizens, its public officials and its public employees of the right to have the

business of the Village of Fox Lake conducted honestly, fairly and impartially, free from collusion, partiality, dishonesty, conflicts of interest, and fraud; (c) the Village of Fox Lake and its citizens, its public officials and its public employees of the right to make a cable television franchise award with full disclosure of ownership interests; and to obtain the Village of Fox Lake cable television franchise contract by means of false and fraudulent representation and promises, knowing them to be false when made. . . ."

The instructions to the jury provided in part:

A scheme means some plan or course of action intended to deceive another and to deprive another of something of value by means of false pretenses, representations, or promises.

A scheme to defraud under the Mail Fraud Statute may include a plan to deprive citizens of the honest and impartial functioning of a public official and this is "something of value" within the meaning of the mail fraud statute.

1022, 59 L.Ed.2d 75 (1979). Rabbit, who was an elected member of the Missouri State House of Representatives, was indicted for defrauding the citizens of Missouri by (1) accepting a ten percent commission on architectural contracts awarded to a firm he recommended to persons authorized to employ architects for state-related projects, and (2) concealing or failing to make public his interest in those contracts. The court in *Rabbitt* found that there was no tangible or intangible loss suffered by the citizens of Missouri because the contracts were awarded on merit by the state officials. *Id.* at 1025–26. The Eighth Circuit held that the defendant's acceptance of commissions on state architectural contracts awarded to an architectural firm he recommended to the state officials responsible for awarding such contracts did not establish of itself a violation of the Federal mail fraud statute.

The present case is distinguishable from *Rabbitt.*[14] In *Rabbitt,* the Eighth Circuit stated that: "Rabbitt did not, in his official capacity, control the awarding of state contracts to architects."[15] 583 F.2d at 1026. Whereas in the instant case, the mayor, in his official capacity, had the authority and capacity to break a tie vote of the board if called upon to do so. According to testimony, the mayor was approached by the defendant, in his official capacity, regarding the cable franchise. Lovett offered and the mayor accepted a 5% local ownership in the subsidiary of U.S. Cable "to grease the skids." The mayor in turn enlisted Gerretsen, a board member who in effect was able to control three of the six votes on the board, and thus fulfill the objective of the payoff scheme. The mayor's local ownership interest in U.S. Cable's subsidiary remained secret and was not disclosed to the board before they voted on the Fox Lake cable franchise.[16] It does not take too active an imagination to reach the conclusion that Mayor Hamm was not acting in the best interests of his constituents and not rendering faithful and honest services in the performance of his duties and responsibilities as a public employee when he accepted payoff money to influence his action in the awarding of the cable contract. It is also reasonable to conclude that since the mayor was receiving a payoff, that the citizens of Fox Lake were not having the business affairs of Fox Lake, Illinois conducted with the type of honesty, fairness, and impartiality and free of conflicts of interest they were entitled to.

The defendant's argument that in the absence of the mayor not actually performing some official act (not casting a vote) there is no violation of the statute is not convincing. Lovett offered and Mayor Hamm accepted a bribe (5% interest in U.S. Cable's local subsidiary) with the intent of influencing the awarding of the cable franchise. In *United States v. George,* 477 F.2d 508 (7th Cir.1973), a case in which the defendants were convicted under the mail fraud statute of defrauding the Zenith Radio Corp. of the honest and faithful services of its employee Yonan, we stated:

"Since the gravamen of the offense is a 'scheme to defraud,' it is unnecessary that the Government allege or prove that the victim of the scheme was actually defrauded or suffered a loss.... If there was intent on the part of a schemer to deprive Zenith of Yonan's honest and loyal services in the form of his giving [the defendant] preferential treatment, it is simply beside the point that Yonan

---

**14.** The Eighth Circuit in *Rabbitt* uses language that clearly reduces the effect of defendant's argument on this issue:

"Whether a showing of dishonesty on the part of a state official, *outside* his official duties, with no financial loss to the state constitutes a fraud upon the public and thereby statutory mail fraud is, in our judgment, highly questionable."

583 F.2d at 1024 (emphasis added).

**15.** In *Rabbitt,* the evidence indicated that Rabbitt recommended an architectural firm as competent architects to the persons authorized to hire architects for Missouri state projects. Rabbitt was paid by the architectural firm ten percent of the gross fees attributable to his influence.

**16.** At least one board member (Jean Berdnick) testified she would have consulted with attorneys for advice had she been aware of the mayor's hidden interest in the contract.

may not have had to (or had occasion to) exert special influence in favor of [the defendant].... As the Court noted in *Shushan v. United States,* 117 F.2d 110, 115 (5th Cir.1941) certiorari denied, 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531: 'The fact that the official who is bribed is only one of several and could not award the contract by himself does not change the character of the scheme where he is expected to have influence enough to secure the end in view.'"

477 F.2d at 512 (citations omitted). In the instant case, evidence was offered that the defendant approached Mayor Hamm in his official capacity in an effort to have the mayor exert special influence on behalf of his client U.S. Cable. The mayor testified that he did in fact take steps to ensure that U.S. Cable receive the cable franchise and that he had the power to break a tie vote on the board.[17]

█ Evidence was received at trial establishing that the defendant Lovett intended that his client, U.S. Cable, obtain the cable franchise, if need be, in a dishonest and corrupt manner. There also was a mailing that became a part of the scheme: Lovett knowingly caused the United States Postal Service to deliver a letter to Borre confirming the terms of his interest in the local subsidiary. The letter dated July 22, 1980, required Borre to disclose to U.S. Cable the names of any person with whom he intended to share his interest. Evidence was offered that Hamm not only had the authority to break a tie vote of the Board but also that he enlisted Gerretsen, a Board member, to ensure a favorable vote for Lovett's client. We hold the evidence was more than sufficient for a rational jury to find that the defendant had violated elements of the mail fraud statute beyond a reasonable doubt, in that the defendant Lovett knowingly, willfully and unlawfully used the United States Postal Service in a scheme to defraud the citizens of Fox Lake and to defraud the village of Hamm's loyal

services. We therefore refuse to overturn the jury's decision.

### III

The defendant argues that the proof offered at trial concerning the mail fraud scheme for which he was convicted was fatally at variance with the scheme alleged in the indictment. Specifically, Lovett claims that the mail fraud counts and the government's case rested on the allegations of a specific bribe, yet he was convicted on an uncharged "head-in-the-sand" variety of mail fraud—a charge for which he did not present a defense. The issue we must resolve is a simple one: was the defendant convicted of a charge not contained in the indictment?

The Supreme Court has had numerous opportunities to speak on the issue raised by the defendant. In *United States v. Miller,* 471 U.S. 130, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985), the Supreme Court stated: "Convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment." The Supreme Court, in *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) said:

"The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused. The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against another prosecution for the same offense."

295 U.S. at 82, 55 S.Ct. at 630.

Lovett cites *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252

---

**17.** The relevant testimony provided:

MR. RAPHAELSON: (Counsel for the Prosecution) And if in addition to his [Gerretsen's] own vote he controlled just two votes * * * and there was a three/three tie amongst the Village Board members, was there a tie-breaking procedure?

MAYOR HAMM: Yes, sir. I vote when ties occur.

(1960), in support of his argument that there was a fatal variance between the scheme alleged in the indictment and the conviction. In *Stirone* the defendant was indicted and convicted of unlawfully interfering with interstate commerce in violation of the Hobbs Act. The indictment charged only that the defendant had interfered with the interstate movement of sand in violation of the Hobbs Act. During Stirone's trial, the United States, over the defendant's objection, proved that the defendant also interfered with the movement of steel in interstate commerce, an offense not charged in the indictment. The Supreme Court in discussing Stirone's conviction stated that there was a variance between the language in the indictment (interference with the interstate movement of sand) and the proof offered at trial (interference with the interstate movement of sand *and* steel), and, that the variation "[d]estroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." 361 U.S. at 217, 80 S.Ct. at 273.

The defendant argues that a proposed instruction by the government as well as the statements made by the presiding judge at trial and during the sentencing phase demonstrate the existence of a fatal variance between what he was convicted of and the language set forth in the indictment. Lovett argues that the government for the first time at the close of the case of all of the evidences requested that the case be submitted to the jury in the form of an instruction referred to as the "head-in-the-sand" instruction. The instruction stated that the defendant could not "intentionally avoid knowledge with the conscious purpose to avoid learning the truth by closing his eyes to facts which would prompt him to investigate." (Proposed Government Instruction No. 20). The defendant claims the proffered instruction was an attempt to convict the defendant on the basis of his own testimony.[18]

---

18. The following exchange took place in open court on August 5, 1985, prior to closing arguments:

MR. RAPHAELSON: (Counsel for the Prosecution) With the exception of the knowingly instruction, which you have two versions of. One was the head-in-the-sand—what's called the head-in-the-sand sentence at the end, the other without, which is instructions 20–A and 20–B.

Our position is this, Judge: Mr. Lovett testified on, I don't recall if it was direct or cross right now, but he testified that—he used the words, "I closed my eyes to whatever evil lay in anybody else's mind when I was having all of these discussions."

I think that at least in rebuttal, depending on how Mr. Cacheris' [defendant's counsel] argument goes, I may wish to argue that Mr. Lovett, an attorney, is telling you as part of his defense that he's closing his eyes to whatever the consequences of his actions are, and the law doesn't allow him to do that. To somehow challenge in rebuttal argument Mr. Lovett's ability to suggest that as a defense.

And I think even on that limited basis we should be able to have the instruction. It is an accurate statement of the law and we're asking for the additional sentence.

THE COURT: We discussed yesterday at the instruction conference the possibility that the government would argue in the alternative that if you accepted Mr. Lovett's testimony as true, that it also could constitute proof of at least the mail fraud count.

I take it you're not going to make that argument.

MR. RAPHAELSON: No.

THE COURT: So you're left with arguing the case on the basis of your own witnesses who testified specifically to a conversation in which a specific bribe was offered and concealment of the bribe.

I think under those circumstances the head-in-the-sand sentence to the knowingly instruction would be very confusing. It doesn't fit the facts. Now, for you to argue—I don't think that forecloses you from arguing on rebuttal that he closed his eyes and his mind to the true facts. But I think it's a mistake for me to give that as part of the instruction.

* * *

THE COURT: So you are going to argue it. I mean, you've got to make up your mind. You've got to argue it in your first argument, otherwise it would be improper rebuttal.

MR. RAPHAELSON: Okay. He's not going to argue it. That's it.

THE COURT: All right.

MR. CONNELLY: (Counsel for the Prosecution) We're not arguing it on the front end.

The defendant argues that the statements made by the presiding judge at sentencing demonstrate that the Government proved a crime not charged in counts five and six of the indictment. During the Government's sentencing recommendation, the prosecutor argued for an enhanced sentence on the ground that the defendant had perjured himself and lied during portions of his testimony. The judge, in sentencing the defendant, stated the following:

THE COURT: Well, let me talk about the defendant's testimony.

The Court as a sentencing court always takes perjury into account in fashioning a sentence. I did not think the defendant perjured himself.

When I heard that testimony, I concluded that what Mr. Lovett did is what he said he did. In other words, I don't think he went up to that mayor and said "I'm going to give this to you and you go find a nominee."

I think what he did do was take the measure of the man at that dinner he arranged early, then he arranged a private lunch with him, and then he said to the mayor, "We've got this five percent interest and we'd like you to recommend somebody."

I think that's a crime, personally. I think that's a bribe, because it's offering an opportunity to appoint somebody to take a five percent interest.

And I concluded that for a couple of reasons. I thought that was more consistent with what the mayor did immediately thereafter. What the mayor did after that lunch was go to his cohort and say, "I think I've been bribed."

If Mr. Lovett had in fact said "I've got five percent for you, but we've got to conceal it, you go find a nominee," there would have been no question in the mayor's mind that he would have been bribed. He would have gone to his cohort and said, "We've got a five percent interest in this transaction."

I think it's also consistent with Mr. Lovett's—well, from the way I think he practiced law; I think he was very careful.

I think he wouldn't have been so stupid as to walk into a town which had a, quote, reform mayor, a guy who had been elected to replace a corrupt mayor, a guy who had run on a reform platform, and been so blatant, and said "I'm from out of town and I've got a bribe for you." I just don't think he would have done that.

I think what he did was to be more sly. And we talked about this in chambers, we talked about the government could have pled the case differently. The likelihood of Mr. Lovett having been convicted under the head-in-the-sand kind of instruction was quite high. But that was my view of the facts. So I am not going to incarcerate Mr. Lovett for perjury. I concluded that he was telling the truth.

Regrettably, I think the truth was not very helpful to him. I think what he did was try to influence the action of that mayor by offering him the opportunity to select somebody who was going to get a fairly significant financial remuneration. I think that's a bribe. It's a more careful bribe. It's apparently what goes on in the cable industry all the time.

I think there's something wrong with an industry that goes around offering

THE COURT: On the what?

MR. CONNELLY: I don't know why it would make improper rebuttal. It would only rebut some claim that was made by the defendant. But we will not argue it on the front end, and we don't presently intend to argue it on the back end.

THE COURT: Well, if it occurs to you that you think the door has been opened for such an argument on rebuttal, we'll take a recess, because I think it will take a discussion. But I think it's a totally new kind of bribery crime that you're talking about; and to raise it on rebuttal for the first time wouldn't be proper. So it would have to directly relate to something Mr. Cacheris argued.

public officials the opportunity to appoint people to get free gifts. Something is terribly wrong with that.

The jury obviously believed Mr. Lovett was guilty. I don't know whether they accepted Mayor Hamm's testimony over Mr. Lovett's testimony. I've read with interest the newspaper reports about how the jurors talked about the verdict. But I agree with the government and the defendant that I should put that aside.

I'm going to sentence on the basis of the jury verdict. They convicted on two counts. It's a serious crime. It's bribery. Even under my view of the facts it's bribery, albeit a crime not expressly charged by the government.

■ Any analysis of the exchange that took place in court concerning the proposed instruction and the judge's comments before sentencing requires that they be placed in their proper context. The discussion regarding the proposed instruction on the "head-in-the-sand" theory as a basis for finding the defendant guilty took place before closing arguments out of the presence of the jury. The prosecution did not present the "head-in-the-sand" theory as a basis for finding the defendant guilty in its closing arguments and thus the instruction was not given. The judge's comments in sentencing the defendant were not made as a trier of fact, but for purposes of sentencing only. The government had sought an enhanced sentence for the defendant on the grounds that he perjured himself. The judge's comments were directed and limited to resolving the question of whether the defendant had, in fact, perjured himself. A trial judge may consider a defendant's truthfulness while testifying in determining what sentence should be imposed and can enhance the sentence if she believes the defendant has committed perjury before her. *United States v. Harris*, 761 F.2d 394, 403–404 (7th Cir.1985). The judge's statement prior to sentencing the defendant did not reject the jury's verdict:

"I'm going to sentence on the basis of the jury's verdict. *They* convicted on

two counts. It's a serious crime. It's bribery. Even under my view on the facts it's bribery, although not expressly charged by the government."

(emphasis added) Despite the defendant's piecemeal efforts to take the judge's comments out of context, we have no doubt whatsoever that the judge agreed with the guilty verdict of the jury. In denying the defendant's Rule 29 motion for judgment notwithstanding the verdict, the court stated:

"With respect to the motion for judgment at the close of all the evidence, the motion is denied. I found the evidence persuasive, and I would deny the motion at the present time at the close of all the evidence."

■ The question is: Did the jury convict the defendant on the basis of what was charged in the indictment? Taking into account the argument offered by the defendant and a review of the record we are convinced that the evidence offered at the defendant's trial did not vary from the fraudulent payoff scheme detailed in the indictment. Paragraphs two through twelve of count five of the indictment regarding mail fraud set forth the scheme to defraud in violation of 18 U.S.C. § 1341. The government produced evidence that the defendant Lovett offered Mayor Hamm a five percent interest in the local cable franchise and suggested that the mayor conceal his ownership interest in someone he could trust as his nominee. Evidence was offered that the mayor enlisted Gerretsen and Borre into the scheme and that the five percent interest would be divided with Hamm and Gerretsen each receiving two percent and Borre one percent. Gerretsen's percentage was in return for influencing the votes on the Village Board he controlled. Borre's interest was in exchange for acting as nominee. U.S. Cable was awarded the Fox Lake franchise. The indictment delineated the scheme to defraud; the proof presented to the jury was in accord with what was charged.

Unlike the indictment in *Stirone*, the indictment in this case was not constitutionally broadened. In *Stirone*, although the indictment charged only that the defendant had interfered with the interstate movement of sand, proof was offered at trial that the defendant interfered with the movement of steel as well as the sand referred to in the indictment in interstate commerce. In the instant case, Lovett has failed to establish just what proof much less what evidence the prosecution offered at trial that was inconsistent with the indictment. The defendant had a full opportunity to present a defense to the bribery charges recited in the indictment. We are convinced there was no variance because "[t]he proof upon which [the conviction was] based corresponds to an offense that was clearly set out in the indictment." *United States v. Miller*, 471 U.S. 130, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985). We thus reject the defendant's argument that the mail fraud scheme for which he was convicted was fatally at variance with the scheme alleged in the indictment.[19]

## IV

■ The defendant lastly appeals the district court's order requiring him to pay $150,000 in restitution to the citizens of the Village of Fox Lake pursuant to 18 U.S.C. § 3651.[20] A judge may impose restitution as a condition of probation in sentencing a defendant. In reviewing the sentencing decision of the trial court, we may overturn the sentencing decision, or any part of it, if we decide the district judge has abused her discretion. *United States v. Harris*, 761 F.2d 394, 404 (7th Cir.1985). Restitution is not to be used by a court in lieu of a fine, but only to compensate persons who have been injured by a defendant's actions. *United States v. Ramirez*, 555 F.Supp. 736, 743 (E.D.Cal.1983). In a recent decision, the Supreme Court stated:

"Restitution is an effective rehabilitative penalty because it forces the defendant to confront, in concrete terms, the harm his actions have caused. Such a penalty will affect the defendant differently than a traditional fine, paid to the State as an abstract and impersonal entity, and often calculated without regard to the harm the defendant has caused. Similarly, the direct relation between the harm and the punishment gives restitution a more precise deterrent effect than a traditional fine."

*Kelly v. Robinson*, —— U.S. ——, 107 S.Ct. 353, 360–361 n. 10, 93 L.Ed.2d 216 (1986).

This circuit has required that the amount ordered to be paid in restitution as a condition of probation must be ascertained and delineated with an accurate computation and cannot be in excess of the loss actually caused and established, and must be clearly set out with specific findings and directions in the record and order of restitution. *See United States v. Lynch*, 699 F.2d 839 (7th Cir.1982); *see also United States v. Roberts*, 619 F.2d 1 (7th Cir.1979) (when the district court determines with specificity the amount of actual damages caused by the defendant, and there is sufficient identification of the victim to allow reparation, the dictates of 18 U.S.C. § 3651 are met). In *Harris*, 761 F.2d at 404, this court stated that the amount of loss caused by the offense may be proved in any one of three ways: "by proof at trial, by judicial determination, or through the consent of the defendant." (citing *United States v. Gering*, 716 F.2d 615, 625 (9th Cir.1983)).

---

19. The defendant goes to great lengths to attack the credibility of Mayor Hamm's testimony. A reviewing court will not weigh the evidence or assess the credibility of the witnesses. *United States v. Wilson*, 715 F.2d 1164, 1173 (7th Cir.), *cert. denied sub nom. Williams v. United States*, 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983).

20. Title 18 U.S.C. § 3651 provides in part:
   While on probation and among the conditions thereof, the defendant—* * * May be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had. . . .

If the defendant had assented to the order of restitution, we would have no problem but he did not consent. After a review of the trial, we are at a loss to find evidence in the record that would substantiate the imposition of the $150,000 figure as a measure of the actual damage or loss suffered by the citizens of the Village of Fox Lake.[21] "Any amount to be paid in restitution must be obtained by accurate computation and cannot exceed the amount of loss actually caused." *United States v. Lynch*, 699 F.2d 839, 845 (7th Cir.1982).

We hold that the trial court abused its discretion in ordering the defendant to pay $150,000 restitution without reference to any computation or factual support. In vacating the district court's order of restitution, we wish to note that Lovett was not the recipient of the bribe. After review of this decision should the trial judge determine an order of restitution is proper, and we express no opinion on this determination, then such order shall be substantiated with delineations of specific findings and computations.

### V

We affirm the defendant's conviction, vacate the district court's order of restitution, and remand to the district court for proceedings consistent with this opinion.

---

21. There was some speculation as to the value of the five percent local ownership interest that was given to the mayor. The government's theory that, "Mr. Lovett, in buying the mayor of Fox Lake, set the value of that loss to the community" is clearly inadequate substantiation for the restitution figure.