**REVISED**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-40560

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL BRYANT BRUMLEY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Texas

_____

June 18, 1997

Before POLITZ, Chief Judge, and KING, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, PARKER, and DENNIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Michael Bryant Brumley was convicted in a bench trial of conspiring to defraud the citizens of the State of Texas of honest services by use of interstate wire communications and the United States mail in violation of 18 U.S.C. § 371, three counts of wire fraud in violation of 18 U.S.C. § 1343, three counts of money laundering in violation of 18 U.S.C. § 1956, and two counts of making a false statement to a financial institution in violation of

18 U.S.C. § 1014.  Brumley does not appeal his conviction on the last two counts of defrauding a financial institution, and they are not before us.

As we will explain, Brumley's primary contention is that the government has misused federal criminal statutes to prosecute a state employee for ethical lapses.  Along the way to review by the en banc court the issues on appeal have narrowed to four.  First, Brumley urges that neither the plain language of § 1346 nor its legislative history expands the types of victims protected by the statute to include a state employer.  Second, he insists that an ethical lapse, or at worst a state misdemeanor, is not a deprivation of honest services.  Third, he argues that the Commerce Clause does not support § 1346.  Finally, he contends that the money laundering statute does not reach his conduct.  Brumley also challenged the statute and the indictment on vagueness grounds in the district court, but he did not pursue these contentions on appeal.

We reject each of these contentions and affirm the convictions.  In doing so we reject the argument that Congress failed in its 1988 effort to expand the statute to cover the deprivation of honest services which the McNally and Carpenter decisions found were outside the statute's reach. See Carpenter v. United States, 484 U.S. 19, 25 (1987); McNally v. United States, 483 U.S. 350, 359-60 (1987).  This argument has gathered strength from the Supreme Court's recent Commerce Clause decisions, but we

2

ultimately conclude that it cannot escape the plain language of § 1346.

## I

A panel of this court first reversed the convictions for wire and mail fraud, as well as money laundering and conspiracy. United States v. Brumley, 59 F.3d 517 (5th Cir. 1995), withdrawn, 79 F.3d 1430 (5th Cir. 1996). The panel reversed for lack of evidence that Brumley could foresee the interstate character of the wire transmission relied upon by the government. After withdrawing this opinion, the panel, with one judge dissenting, held that the term "another" as used in 18 U.S.C. § 1346 does not reach citizens of a state or political subdivision who have been deprived of the honest services of their public officials. United States v. Brumley, 79 F.3d 1430, 1441-42 (5th Cir. 1996). We granted the government's petition for rehearing en banc on July 17, 1996. United States v. Brumley, 91 F.3d 676 (5th Cir. 1996).

## II

Texas' workers' compensation law was long administered by the Texas Industrial Accident Board. Under this regime the Board dealt with three groups: claimants, their lawyers, and insurance carriers insuring the employers. Brumley worked for the Board and resided in Beaumont, Texas. In 1990 the Texas legislature changed the process for resolving workers' compensation claims. The Board became the Texas Workers' Compensation Commission, and Brumley was promoted to Associate Director of the new commission and moved to

3

the new commission's Houston office. Brumley's duties included the handling of claims arising under the old law and, according to the indictment, responsibility for "identifying attorneys and insurance carriers who failed to follow TWCC or IAB rules and regulations." Brumley's work gave him knowledge of the conduct of lawyers, the identity of unrepresented claimants, and the details of the process itself.

Brumley never seemed to be able to live within his income. As early as 1982, he began to solicit loans from lawyers representing claimants and their assistance in obtaining loans from lending institutions. In 1985 and 1986, while he was conducting prehearing conferences in cases in Lufkin, Texas, he charged and never repaid several hundred dollars to the account of a claimant's counsel at the local country club. By 1988 Brumley had borrowed money from at least eight lawyers and struck up a relationship with John M. Cely, a Lufkin attorney with a substantial workers' compensation practice. Cely and persons employed by his law firm made frequent appearances before Brumley in prehearing conferences. They began a process whereby Cely would cause wire transfers to be made from the Western Union office in Lufkin to Brumley at various locations in Texas. These wire transfers were accomplished electronically through a Western Union facility located outside of Texas. From 1987 to May of 1992, Cely made some seventy wire transfers to Brumley totaling approximately $86,730. In all, Brumley "borrowed"

some $112,156 from eleven lawyers, including Cely. None of this sum was ever repaid.

The indictment charged a scheme to defraud "the citizens of the State of Texas, including the members of the Texas Industrial Accident Board . . . , an agency of the State of Texas, from receiving the intangible right to honest services."


III

Brumley contends that Congress did not intend to reach schemes to deprive an entity of state government of the intangible right of honest services in its 1988 enactment of § 1346. That statute provides:

> For the purposes of this Chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

Reading § 1346 with § 1343 we have the following prohibition:

> Whoever, having devised or intending to devise any [scheme or artifice to deprive another of the intangible right of honest services], . . . transmits or causes to be transmitted by means of [interstate wires] for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.

Brumley's present argument, taking a cue from the second panel opinion, takes two related cuts at the application of the statute to his conduct. First, he contends that "another" has the same meaning as the term "whoever" for purposes of the fraud chapter of the criminal code, specifically Chapter 63 of Title 18. And

5

"another" cannot include his state employer or the citizens of the State of Texas. Second, invoking federalism, Brumley contends that Congress failed to state its purpose with the clarity demanded for federal incursions into state matters, at least those traveling on the commerce power.

We are persuaded that a governmental entity qualifies as "another" within the meaning of § 1346, and that "honest services" can include "honest and impartial government." The panel opinion notes that Section 1 of Title I of the U.S. Code provides that "'person' and 'whoever' include corporations, companies, associations, firms, partnerships, and societies, and joint stock companies, as well as individuals." 79 F.3d at 1435. It "note[s] that among the meanings of the word 'whoever' in Section 1, Title I, there is nothing that could even remotely be interpreted or construed to mean 'a state,' 'a political subdivision of a state,' 'a government,' 'a governmental agency,' or 'the citizens of a state as a body politic.'" Id.

Brumley is himself an "individual," and we think he must qualify as a "whoever" within the meaning of the statute, in which case he can be prosecuted for depriving "another" of his intangible right of honest services. This case does not involve a prosecution of a state, state subdivision, government, or agency. Rather, it is a prosecution of an individual who abused his position as an employee of a state commission. That the mail fraud statute

6

reaches Brumley's conduct is consistent with the proposition that the statute does not allow prosecution of a state or state agency.

Moreover, Section 1 of Title I provides that "person" and "whoever" include the listed terms. We read this to mean that "person" and "whoever" include the listed terms without deciding whether other non-mentioned entities may qualify as a "person" or a "whoever." Otherwise, Congress would have said something other than "include," such as "person" and "whoever" mean the listed terms (or consist of, or perhaps include only). In this criminal statute, "another" defines the range of victims while "whoever" defines the perpetrator; we do not think it makes sense to define the victims by reference to the definition of the perpetrator. See United States v. Castro, 89 F.3d 1443, 1456 (11th Cir. 1996) (concluding that the plain language and legislative history of § 1346 do not limit its application to governmental victims of fraud), cert. denied, 117 S. Ct. 965 (1997).

IV

Brumley argues that even if "another" does not modify "whoever," it does not include "citizens as the body politic." The exact thrust of this contention is uncertain, given the fact that the defendant is not a political entity but a person charged with fraudulent activity while employed by a state entity. We understand the argument to be that "another" should not be read to reach such abuses of state office. The contention is that § 1343 is at least sufficiently uncertain that it need not be so read, and

7

traditional principles of lenity and the doctrine of clear statement counsel that it should not be.  The argument points to McNally itself, specifically the Court's observation that:

> Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read [the statute] as limited in scope to the protection of property rights.  If Congress desires to go further, it must speak more clearly than it has.

483 U.S. at 360.

The argument fails because Congress accepted the Court's invitation and was clear in its purpose.  First, we think the statutory language plainly reaches state officials such as Brumley, and thus it is unnecessary to repair to legislative history.  That history is recounted by the dissent and by the panel majority, *see* 79 F.3d at 1435-40, and we will not rehearse it again.  There is nothing to suggest that Congress did not intend by § 1346 to overturn the Supreme Court's McNally decision and to insist that the fraud statutes cover deprivations of intangible rights such as those charged in the counts for which Brumley was convicted.  We join the First, Fourth, and Eleventh Circuits in rejecting similar attacks on § 1343 convictions.  United States v. Sawyer, 85 F.3d 713, 723-24 (1st Cir. 1996); United States v. Bryan, 58 F.3d 933, 939-43 (4th Cir. 1995); United States v. Waymer, 55 F.3d 564, 568 n.3 (11th Cir. 1995), cert. denied, 116 S. Ct. 1350 (1996).

8

The dissent, worried that the text of § 1346 fails to give citizens adequate notice, accuses the majority of illicitly re-drafting a criminal statute. But we are hardly announcing a common-law crime. As the Supreme Court has recently explained, "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." United States v. Lanier, ___ U.S. ___, ___, 117 S. Ct. 1219, 1225 (1997). Gauging fair notice requires an inquiry into the state of the law as a whole, not merely into the words printed on a single page of the United States Code. Constructions of a statute announced by the Supreme Court or lower courts can give citizens fair warning, even if the cases are not "fundamentally similar." Id. at ___-___, 117 S. Ct. at 1226-28.

Here Brumley had notice that Congress had repudiated the Supreme Court's interpretation in McNally. Congress, in other words, announced that it wanted the courts to enforce the honest-services doctrine developed in the years leading up to McNally. Because Congress was not faced with a uniform formulation of the precise contours of the doctrine, some defendants on the outer reaches of the statute might be able to complain that they were not on notice that Congress criminalized their conduct when it revived the honest-services doctrine. But even if there are such defendants, Brumley is not among them. As we will explain, his conduct was inconsistent with his duties under Texas law. The

9

boundaries of "intangible rights" may be difficult to discern, but that does not mean that it is difficult to determine whether Brumley in particular violated them.  See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 505, 102 S. Ct. 1186, 1196 (1982) (rejecting a vagueness challenge to a quasi-criminal ordinance regulating the sale of drug paraphernalia because the ordinance was "reasonably clear in its application to the complainant").

## V

We must next find the meaning of honest services as used in this federal statute.[1]  As we have explained, Congress has insisted that the fraud statutes cover the deprivation of intangible rights. In doing so, it reestablished the honest services doctrine.  It bears emphasis that before McNally the doctrine of honest services was not a unified set of rules.  And Congress could not have intended to bless each and every pre-McNally lower court "honest services" opinion.  Many of these opinions have expressions far broader than their holdings.  See United States v. Curry, 681 F.2d 402, 419 n.1 (5th Cir. 1982) (Garwood, J., concurring).  Congress, then, has set us back on a course of defining "honest services," and we turn to that task.

---

The  statute continues to draw much cogent and scholarly commentary.  See, e.g., George D. Brown, Should Federalism Shield Corruption?--Mail Fraud, State Law and Post-*Lopez* Analysis, 82 Cornell L. Rev. 225 (1997).

10

Before McNally, the meaning of "honest services" was uneven. See, e.g., United States v. Holzer, 816 F.2d 304, 307-10 (7th Cir.) (affirming the conviction of a county judge who accepted "loans" from attorneys who practiced before him, even though the government never showed that the judge ruled differently in a case because of any lawyer's willingness to make a "loan"), vacated, 484 U.S. 807 (1988) (remanded for reconsideration in light of McNally); United States v. Silvano, 812 F.2d 754 (1st Cir. 1987) (affirming the conviction of a city budget director who did not disclose his secret plan to enrich a friend with an expensive and unnecessary project bid); United States v. Lovett, 811 F.2d 979 (7th Cir. 1987) (affirming the conviction of a mayor who accepted an undisclosed 5% interest in a local cable company attempting to bid on a city franchise); United States v. Bruno, 809 F.2d 1097, 1104-06 & n.1 (5th Cir.) (affirming convictions under § 1343 based on a scheme to bribe), cert. denied, 481 U.S. 1057 (1987); United States v. Barber, 668 F.2d 778 (4th Cir.) (affirming the conviction of an Alcoholic Beverage Control Commission official who "withdrew" liquor from a state warehouse with subsequent "authorization" from liquor companies so that the companies would be billed), cert. denied, 459 U.S. 829 (1982); Bradford v. United States, 129 F.2d 274, 276 (5th Cir.) (grounding a § 1343 conviction on a scheme to use city officials' positions to sell buses to the city at exorbitant prices for unearned profits), cert. denied, 317 U.S. 683 (1942); Shushan v. United States, 117 F.2d 110, 115 (5th Cir.) ("No

11

trustee has more sacred duties than a public official and any scheme to obtain an unfair advantage by corrupting such a one must in the federal law be considered a scheme to defraud."), <u>cert. denied</u>, 313 U.S. 374, 314 U.S. 706 (1941).

A close look at these cases uncovers two uncertainties regarding the draw by this federal statute upon state law, specifically in defining the statutory element of honest services. First, must the services be owed under state law? Second, must the breach of a duty to provide services rooted in state law violate the criminal law of the state? We decide today that services must be owed under state law and that the government must prove in a federal prosecution that they were in fact not delivered. We do not reach the question of whether a breach of a duty to perform must violate the criminal law of the state.

We begin with the plain language of the statute. There are two words — "honest" and "services." We will not lightly infer that Congress intended to leave to courts and prosecutors, in the first instance, the power to define the range and quality of services a state employer may choose to demand of its employees. We find nothing to suggest that Congress was attempting in § 1346 to garner to the federal government the right to impose upon states a federal vision of appropriate services — to establish, in other words, an ethical regime for state employees. Such a taking of power would sorely tax separation of powers and erode our federalist structure. Under the most natural reading of the

12

statute, a federal prosecutor must prove that conduct of a state official breached a duty respecting the provision of services owed to the official's employer under state law. Stated directly, the official must act or fail to act contrary to the requirements of his job under state law. This means that if the official does all that is required under state law, alleging that the services were not otherwise done "honestly" does not charge a violation of the mail fraud statute. The statute contemplates that there must first be a breach of a state-owed duty. It follows that a violation of state law that prohibits only appearances of corruption will not alone support a violation of §§ 1343 and 1346. See United States v. Sawyer, 85 F.3d 713, 728-29 (1st Cir. 1996). As the Ninth Circuit put it, "[t]o hold otherwise that illegal conduct alone [would suffice] would have the potential of bringing almost any illegal act within the province of the mail fraud statute." United States v. Dowling, 739 F.2d 1445, 1450 (9th Cir. 1984), rev'd on other grounds, 473 U.S. 207 (1985).

Stated another way, "honest services" contemplates that in rendering some particular service or services, the defendant was conscious of the fact that his actions were something less than in the best interests of the employer — or that he consciously contemplated or intended such actions. For example, something close to bribery. If the employee renders all the services his position calls for, and if these and all other services rendered by him are just the services which would be rendered by a totally

13

faithful employee, and if the scheme does not contemplate otherwise, there has been no deprivation of honest services. See, e.g., United States v. Czubinski, 106 F.3d 1069, 1077 (1st Cir. 1997) (reversing convictions under §§ 1343 and 1346 because although unauthorized browsing of taxpayer files by an IRS employee constitutes a breach of personnel policies, "there [was] no suggestion that he failed to carry out his official tasks adequately, or intended to do so"); United States v. Rabbitt, 583 F.2d 1014, 1026 (8th Cir. 1978), cert. denied, 439 U.S. 1116 (1979); United States v. McNeive, 536 F.2d 1245, 1246 (8th Cir. 1976). Thus, the mere violation of a gratuity statute, even one closer to bribery than the Texas statute, will not suffice. Sawyer, 85 F.3d at 729-30.

Finally, the statute proscribes an actual scheme or artifice to defraud. There is nothing in the informing principles of federalism or legislative history to suggest that the scheme or artifice to defraud elements are drawn from state law. Rather, they are familiar terms of federal criminal law generating and drawing their sustenance from federal common law. These wholly federal elements, read with the jurisdictional elements of mail usage and coupled with the draw upon state law for the definition of service, allow the statute to serve federal interests without supplanting rights of core state governance. The indictment charged that Brumley used his position to assist Cely in exchange

14

for money.  Thus, the federal component of the crime was properly charged, and, as we will explain, was proved.

We pause to put aside the frequent invocations of a deprivation of citizens' rights to honest services.  See Bruno, 809 F.2d at 1105-06; Shushan, 117 F.2d at 115.  The reference to such "rights" of citizens has little relevant meaning beyond a shorthand statement of a duty rooted in state law and owed to the state employer.  Despite its rhetorical ring, the rights of citizens to honest government have no purchase independent of rights and duties locatable in state law.  To hold otherwise would offer § 1346 as an enforcer of federal preferences of "good government" with attendant potential for large federal inroads into state matters and genuine difficulties of vagueness.  Congress did not use those words, and we will not supply them.

The federalism arguments that inform the definition of "honest services" under federal criminal law are powerful, and we acknowledge them in our holdings today.  A sitting state official with adjudicatory authority who accepts payments from lawyers practicing in front of him and simultaneously acts for those lawyers in his official capacity contrary to his state-law duty has provided dishonest services to his employer, here the Texas Industrial Accident Board and its successor, the TWCC. As it turns out, Texas condemns such conduct by making it a criminal offense punishable by imprisonment for up to one year and a fine as large as $4,000, and this violation was part of a fraudulent scheme and

15

conspiracy under § 1346, as found by the district court. The tension inherent in federal criminalization of conduct by state officials innocent under state law is absent here.

We have held that services under § 1346 are those an employee must provide the employer under state law. Using his office to pursue his own account and not that of his employer, Brumley violated a Texas criminal statute. This case does not then require us to decide whether the amended federal statute criminalizes conduct no part of which is criminal under state law. Cf. United States v. Cochran, 109 F.3d 660, 667 (10th Cir. 1997) ("[I]t would give us great pause if a right to honest services is violated by every breach of contract or every misstatement made in the course of dealing.").

Our previous cases have not made clear the use of state law we emphasize today. To the extent our prior cases are contrary, they are overruled.

VI

Having concluded that § 1343 applies to deprivations of honest services by state employees and that such services must be owed under state law, we now address Brumley's contention that his own actions did not do so. At trial, the government stipulated that it would not try to prove that any IAB award was enhanced by Brumley or that any claimant was awarded more money by Brumley or that Brumley referred any unrepresented claimant to an attorney in return for cash. Rather, the government's "position [was] that the

16

quid pro quo [was] intangible, such as favoritism or other types of intangible matters." The government points out that Cely admitted to the trial court that the $86,780 in payments to Brumley were not "loans." And during the time period that Brumley was receiving these payments from Cely, Brumley vouched for Cely's good character when Cely was investigated by IAB and interceded to try to stop the investigation altogether. Brumley also advised Cely on the alteration of documents subpoenaed by the IAB, so as to make easy detection of wrongdoing difficult. The relationship between Cely and Brumley was so tight that when one of Cely's employees inquired into Cely's unconcerned confidence about an impending TWCC/IAB investigation of Cely, he replied: "We have Brumley." Brumley also helped Cely's attempt to lease property in Lufkin to the TWCC by advising Cely how to conceal his efforts and by aggressively discouraging the TWCC from leasing from another bidder.

The district court found "ample and convincing" evidence to support each of the counts of the indictment. According to the district court, Brumley and Cely engaged in a conspiracy in which Cely would give Brumley money and Brumley would use his position with the IAB and TWCC to assist Cely's dealings with the agency. Although the district court found clear evidence of ethical violations, it did not rely on them to make its decision. Instead, the district court found a scheme to defraud that included conduct that violated Texas penal law. See Tex. Penal Code Ann. § 36.08(e) (making it a Class A misdemeanor for a public servant with judicial

17

authority to "solicit[], accept[], or agree[] to accept any benefit from a person the public servant knows is interested in or likely to become interested in any matter before the public servant or [his] tribunal").

Brumley's other contentions are without merit, and we affirm the judgment of convictions.

AFFIRMED.

JOLLY and DeMOSS, Circuit Judges, with whom SMITH, Circuit Judge, joins, Dissenting:

We respectfully dissent from what we consider to be an issue-evasive and jurisprudentially flawed majority opinion. With little analysis, and much judicially engrafted legislation, it holds that general, undefined, vague, and ambiguous words constitute a clear statement that Congress intended for federal prosecutors and grand juries to police the conduct of state officers acting in their official state capacities. We should make clear that we do not at all suggest that the criminal statute at issue is unconstitutional or must otherwise be stricken -- only that as the statute is applied in this case, the indictment and proof fails to state and prove a crime.

**INTRODUCTION**

First, the majority needs to be reminded that when interpreting a criminal statute, courts must apply the rule of lenity; that is, when choosing between two readings of a criminal statute, the courts <u>must</u> favor the narrower interpretation unless Congress has spoken to the contrary in language that is clear and definite. This is an indisputable rule of statutory construction ignored by the majority. Second, the Supreme Court has emphasized that when a statute is applied, as here, to alter the balance of federalism, congressional intent must be plain on the face of the

statute -- an intent that even infrared eyes cannot detect from this statute.

The words we interpret today are these few: "For the purpose of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." For the majority to prevail, these words must clearly demonstrate that Congress intended to apply the wire fraud statute to police the integrity of state officials acting in the capacities of their offices. Moreover, these words must satisfy constitutional due process, which requires that citizens be given fair notice that specific conduct constitutes a crime.

The majority utterly fails to address these principles of statutory construction. The reason the majority opinion avoids raising these crucial matters is simple: it cannot possibly conform its conclusions with principles of statutory construction.

Principles of statutory construction are not the only obstacles to the majority's reading of the statute. The legislative history is also devastating to the majority's position that Congress has spoken clearly in § 1346 to reach the conduct of state officers acting in their official capacity. Because the statute fails on its face to make a crime of the charged conduct, this dissent need not address the matter of legislative history. The legislative history does, however, make plain beyond any doubt that § 1346 cannot be fairly construed to reflect a clear congressional intent to police the integrity of state officers.

20

Thus, rather than deal with the legislative history, the majority pursues the only course available to it:  silence.

Indeed, the only significant issue in this case that the majority squarely faces is the meaning of "honest services," a term that the majority acknowledges is ambiguous and undefined by Congress.  One would think that the majority would directly acknowledge that this patent and indisputable ambiguity cripples this prosecution.  But no.  Instead, the majority assumes a role somewhere between a philosopher king and a legislator to create its own definitions of the terms of a criminal statute.  Surely, the majority should recognize the laudatory principle to which we as a Court try scrupulously to adhere: The courts may not assume the place of Congress by writing or rewriting criminal laws pursuant to which citizens will be prosecuted.  This is solely the prerogative of Congress.  With great respect for the usual judgment of our colleagues, we must say that the majority opinion in this respect is hardly a judicial opinion.[2]

_____

That it is necessary for the majority to write more in the nature of legislative drafting than judicial reasoning underscores that the majority implicitly acknowledges that the statute does not reflect a clear statement of Congressional intent. For example, the majority says at page 10, "We decide today" that "honest services" must be owed under state law in order to establish a crime under § 1343 as amended by § 1346.  Furthermore, at page 14, the majority overrules all previous cases that criminalize conduct under § 1343, if these cases involve less, or more, than the majority's determination of the appropriate state law component.  In short, the majority's legislative engraftment onto § 1343 gives the appearance that Brumley is being convicted of a crime that is now in the process of being devised by the Court.

21

The majority opinion is flawed in other respects as we shall develop more fully in this dissent. Its argument that it makes no sense to "define victims by reference to the definition of the perpetrator" is sophistry, a glib phrase giving the appearance of a truism, resorted to by the majority because it can provide no answer to otherwise define the meaning of "another" as it appears in the statute. Although it may be less than a perfect method of divining the hidden intent of Congress, we suggest that defining "another," which is otherwise completely undefined by Congress, by referring to "whoever," is an absolutely correct grammatical construction of the one-sentence statute; at least it provides some definitional meaning or limits to the term "another." The majority opinion provides no definitional limits for a key term in a criminal statute. The majority also says nothing about the due process problems of sufficient notice of what behavior has been prohibited when such key terms have no definitional limits.

In this dissent, we shall further show that the majority, without any analysis, baldly states that "another" means the citizens as the body politic. It is beyond our capacity to accept the conclusion that by using the term "another" in § 1346, Congress clearly has referred to the entire "body politic" of the State of Texas. In so concluding without analysis, the majority gives the phrase judicial chutzpa new meaning.

After the majority completes its assumed legislative task of defining honest services, it appears to have some second thoughts

22

about the application of "another" to the body politic, and "pauses" to

> put aside the frequent invocations of a deprivation of citizens' rights to honest services. The reference to such "rights" of citizens has little relevant meaning beyond a shorthand statement of a duty rooted in state law and owed to the state employer. Despite its rhetorical ring, the rights of citizens to honest government have no purchase independent of rights and duties locatable in state law. To hold otherwise would offer § 1346 as an enforcer of federal preferences of "good government" with attendant potential for large federal inroads into state matters and genuine difficulties of vagueness. Congress did not use those words, and we will not supply them.

Maj. Op. at 13 (internal citation omitted). It is certainly true that Congress did not use those words. Indeed, that is a major point of this dissent. The indictment, however, used those words. Does the majority conclude that the indictment charges the specifics of a crime unauthorized by Congress? If for no other purpose than to remind the majority, we point out that the indictment charged Brumley with depriving "the citizens of the State of Texas . . . from receiving . . . honest services." Yet the majority says the term has no "purchase." No purchase? The deprivation of the "citizens of Texas rights to honest services" in this case has "purchased" a federal prison sentence for Mr. Brumley.

We turn now to more fully address the substantive issues raised by this appeal. We first address the Supreme Court opinions in *McNally* and *Carpenter*, the cases that prompted the passage of §

23

1346.  We will then show how the Supreme Court has made it unmistakably plain that Congress must make a clear statement when it intends to extend a criminal statute into policing the behavior of state officials.  Next we will show that the statutory language cannot possibly be interpreted as such a clear statement, and that the legislative history debunks the majority's position that § 1346 is a clear statement that Congress intended to police the honesty of state government officials in their official capacities.  Finally, we demonstrate that the phrase "honest services" is entirely ambiguous.

## *McNALLY* AND *CARPENTER*

A thorough understanding of the Supreme Court's landmark decision in ***McNally v. United States***, 483 U.S. 350, 107 S. Ct. 2875, 97 L.Ed.2d 292 (1987), is the first order of business.  This case involved the prosecution of a former public official of Kentucky and a private individual for alleged violation of the federal mail fraud statute, 18 U.S.C. § 1341.  The principal theory of the prosecution in ***McNally***, which was accepted by the courts below, was that the defendants' participation in a self-dealing patronage scheme defrauded the citizens and government of Kentucky of certain "intangible rights," such as the right to have the commonwealth affairs conducted honestly.  The jury convicted the defendants and the Court of Appeals affirmed the convictions,

relying upon a line of decision from the Courts of Appeals holding that the mail fraud statute proscribed schemes to defraud citizens of their intangible rights to honest and impartial government. The Supreme Court granted certiorari and reversed. The most illuminating language of the majority opinion in **McNally** provides that:

> Rather than construe the statute [mail fraud, § 1341] in a manner that leaves its outer boundaries ambiguous and <u>involves the Federal Government in setting standards of disclosure and good government for local and state officials</u>, we read § 1341 as limited in scope to the protection of property rights. If Congress desires to go further, <u>it must speak more clearly than it has</u>.

**Id**. at 360 (emphasis added).

This seven to two majority opinion overturned the theories upon which a large number of prior Circuit Court decisions had been based. Justice Stevens' dissent identifies in detail the prior Circuit Court cases and categorizes them in separate footnotes:

> **Footnote 1**
>
> State and federal officials convicted of defrauding citizens of their right to the honest services of their governmental officials, **id**. at 362;
>
> **Footnote 2**
>
> Elected officials and campaign workers convicted of mail fraud for using the mail to falsify votes, thus defrauding the citizenry of its right to an honest election, **id**. at 363;
>
> **Footnote 3**
>
> In the private sector, agents with clear fiduciary duty to their employers or unions, found guilty of

25

defrauding by accepting kick backs or selling confidential information, *id*. at 363; and

**Footnote 4**

In the private sector, defendants convicted for defrauding individuals of their rights to privacy and other non-monetary rights.  *Id*. at 364.

The key language from *McNally* quoted above clearly states that the majority overruled the body of case law referred to in Justice Stevens' footnotes for two reasons:

1.    The majority did not want to construe the statute as involving the federal government in setting standards of disclosure and good government for local and state officials. This is a healthy recognition of the realities of our federal system and pulls the rug out from under the conceptual analysis used by the Circuit Courts in deciding the cases in footnotes 1 and 2 of the dissent; and

2.    The majority did not want to construe the mail fraud statute in a manner that would create ambiguity in its outer limits, so it said the statute would apply only to the "protection of property rights," thereby pulling the rug out from under the category of cases described in footnotes 3 and 4.

Both the majority opinion and the dissent in *McNally* indicate that Congress might change the Court's construction; but the

majority made it absolutely clear that Congress "must speak more clearly than it has" if it desired to make such changes.

Shortly after its decision in *McNally*, the Supreme Court decided *Carpenter v. United States*, 484 U.S. 19, 108 S. Ct. 316, 98 L.Ed.2d. 275 (1987). In *Carpenter*, a unanimous Supreme Court described its holding in *McNally* as follows:

> We held in *McNally* that the mail fraud statute does not reach "schemes to defraud citizens of their intangible rights to honest and impartial government" and that the statute is "limited in scope to the protection of property rights."

*Id*. at 320 (internal citations omitted).

In *Carpenter*, the Supreme Court found that the property rights, though intangible, were none the less property rights and that "*McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights." *Id.* Therefore, *Carpenter* clearly reaffirms the majority opinion in *McNally*, but recognizes that both tangible and intangible property rights are protected by the mail fraud and wire fraud statutes as they then stood.

Because of the emphasis that the majority opinion places on the circumstance of the employment relationship between Brumley and the TWCC, it should be noted that in *Carpenter* the Court characterized an employer's contractual right to an employee's honest and faithful services as "an interest too ethereal in itself to fall within the protection of the mail fraud statute." *Id*.

27

Consequently, *Carpenter* foreclosed the use of the "intangible right of honest services" doctrine in private employment relationships, just as *McNally* had foreclosed the use of that doctrine as to the defrauding of "citizens of their intangible rights to honest and impartial government."

## PRINCIPLES OF STATUTORY CONSTRUCTION

On the last day of the 100th Congress in October 1988, Congress passed a highly publicized and much debated omnibus drug bill. Attached to that omnibus bill, as one of some 30 other unrelated provisions, was a provision containing the text of what has now been codified as 18 U.S.C. § 1346. *See* Pub. L. 100-690, Title VII, § 7603(a), Nov. 18, 1988, 102 Stat. 4508. Our first task is to decide whether the language used by the Congress in § 1346 satisfies the admonition of the Supreme Court in *McNally* that Congress "speak more clearly than it has."

As with any statutory question, analysis begins with the language of the statute. *Kellogg v. United States*, (*In re West Texas Marketing Corp.*), 54 F.3d 1194, 1200 (5th Cir.), *cert. denied*, ___ U.S. ___, 116 S. Ct. 523, ___ L.Ed.2d ___ (1995). In determining a statute's plain meaning, the courts assume that, absent any contrary definition, "Congress intends the words in its enactments to carry their ordinary, contemporary, common meaning." *Pioneer Investment Services v. Brunswick Associates*, 507 U.S. 380,

28

388, 113 S. Ct. 1489, 1495, 123 L.Ed.2d 74 (1993) (internal quotation marks omitted).  As the Supreme Court has stated: "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S. Ct. 3245, 3250, 73 L.Ed.2d 973 (1982) (internal quotation marks omitted).  If the language is clear, then "the inquiry should end." *United States v. Ron Pair Enterprises*, 489 U.S. 235, 241, 109 S. Ct. 1026, 1030, 103 L.Ed.2d 290 (1989).

In *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), the Supreme Court stated the principles which the Court has long followed in construing criminal statutes passed by Congress:

> First, as we have recently reaffirmed, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812 [(1971)]....  In various ways over the years we have stated that "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States v. Universal CIT Credit Corp.*, 344 U.S. 218, 221 [(1952)]....  This principle is founded on two policies that have long been part of our tradition.  First, "a fair warning should be given to the world in language that the common world will understand of what the law intends to do if a certain line is passed.  To make the warning fair, so far as possible the line should be clear." *McBoyle v. United States*, 283 U.S. 25, 27 [(1931)]....  Second, because of the seriousness of criminal penalties and because criminal punishment usually represents the moral condemnation of the

community, legislatures and not courts should define criminal activity. This policy embodies "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." H. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes* in BENCHMARKS, 196, 209 (1967).

*Id.* at 522-23 (other internal citations omitted).

Therefore, the Supreme Court has recognized that criminal statutes must be construed narrowly. Moreover, the Court has emphasized a second critical principle:

Unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance.... As this Court emphasized only last term in **Rewis v. United States**, [401 U.S. at 812,] we will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction. In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision. In **Rewis**, we declined to accept an expansive interpretation of the travel act. To do so, we said then, "would alter sensitive federal state relationships [and] could overextend limited federal police resources." While we noted there that "[i]t is not for us to weigh the merits of these factors," we went on to conclude that the "fact that they are not even discussed in the legislative history... strongly suggests that Congress did not intend that [the statute have the broad reach]." 401 U.S. at 812... As in **Rewis**, the legislative history provides scanty basis for concluding that Congress faced these serious questions and meant to affect the federal state balance in the way now claimed by the government.

30

*Id.* at 523 (internal footnotes and citations omitted) (alterations in original). When legislation has the potential of altering the relationship between state and federal police powers, this Court must adopt a narrow interpretation of the statute.

It is clear, of course, that, under the Supremacy Clause, the Congress <u>may</u> legislate in areas traditionally regulated by the States. Nevertheless, the Court has emphasized that "[t]his is an extraordinary power in a federalist system. It is a power that we must assume Congress does not exercise lightly." ***Gregory v. Ashcroft***, 501 U.S. 452, 460, 111 S. Ct. 2395, 2400, 115 L.Ed.2d 410 (1991). "If Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so <u>unmistakably clear in the language</u> of the statute." ***Id.*** at 461 (internal citations omitted) (emphasis added).

**INTERPRETING THE TEXT OF SECTION 1346**

The text of § 1346 is only one sentence in length and reads as follows:

> For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

18 U.S.C. § 1346. A plain reading of the statutory text produces numerous ambiguities and questions:

    a.   Who is the "deprivor" and who is the "deprivee?"

31

        b.    What is an "intangible right?"
        c.    What are "honest services?"
        d.    What is "the intangible right of honest services?"

If a criminal statute is to satisfy the "fair warning" test of *Bass*, answers to these questions must be available to the "common world" in a fashion which is clear and readily understandable so that the line where permitted conduct ends and prohibited conduct begins is certain.

The answer to the first question, "Who is the deprivor?," should be clear to the common man.  The chapter referred to is Chapter 63 of Title 18 entitled "Mail Fraud," and the term "scheme or artifice to defraud" appears in four sections:  Section 1341, Mail Fraud; Section 1342, Fictitious Names or Addresses; Section 1343, Fraud by Wire, Radio or Television; and Section 1344, Bank Fraud.  The pronoun "whoever" is the pronoun used at the beginning of each of these sections.  Section 1 of Title I of the United States Code, relating to rules of construction, contains the following definition:

> In determining the meaning of any Act of Congress, unless the context indicates otherwise --
>
> "person" and "whoever" include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals; ....

If one substitutes for the pronoun "whoever" its statutory definition, and if one also inserts the definition of § 1346 in §

32

1343 (Wire Fraud), which is the relevant section involved in this case, the statute reads as follows:

| | |
|---|---|
| **WHO** | [any person, individual, corporation, company, association, firm, partnership, society or joint stock company who], |
| **PROHIBITED CONDUCT** | having devised or intending to devise scheme or artifice [to deprive another of the intangible right of honest services] |
| | transmits or causes to be transmitted by means of wire, radio or television communication in interstate or foreign commerce any writings, signs, signals, pictures or sounds |
| **MOTIVE** | for the purpose of executing such scheme or artifice; etc. |

The answer to the first question, therefore, is that the deprivor is "any person, individual, corporation, company, association, firm, partnership, society or joint stock company."

The answer to the second question, "Who is the deprivee?," is not clear. The word "another" is not defined anywhere in the United States Code. The dictionary says that the first and most frequent use of "another" as a pronoun is "one more; an additional one."[3] Grammarians teach that the word "another," when used as a

_____

WEBSTER'S COLLEGIATE DICTIONARY, Random House, 1992.

33

pronoun, is an indefinite pronoun which has no specific meaning in and of itself but draws its meaning from the context in which it is used.   A logical argument could be made, therefore, that the pronoun "another," as incorporated by § 1346 into § 1343, would have the same meaning as the lists of nouns incorporated into § 1343 by the Title 1, § 1 definition of "whoever."  If this second insertion is made, the first portion of § 1343 (wire fraud) reads as follows:

> [Any person, individual, corporation, company, association, firm, partnership, society or joint stock company who], having devised or intending to devise any scheme or artifice [to deprive any other person, individual, corporation, company, association, firm, partnership, society or joint stock company of the intangible right of honest services] etc.

With these insertions, § 1343 as amended by § 1346 can certainly be read to clearly define the deprivor and the deprivee, setting aside for the time being the definitional problem of what constitutes a "deprivation of an intangible right of honest services."  But these insertions do not solve the interpretation problem in this case, because the indictment charged Brumley with conspiring to defraud and defrauding "the citizens of the State of Texas, including members of the Texas Industrial Accident Board, an agency of the State of Texas, from receiving the intangible right to honest services," and defrauding "the citizens of the State of Texas including the Industrial Accident Board and its successor (the Texas Workman's Compensation Commission), a state agency, of the

34

intangible right to good, faithful and honest service."  There is nothing in the definition of "whoever" in § 1 of Title 1 which could even remotely be interpreted or construed to mean "a state," "the citizens of a state," "a political subdivision of a state," "a governmental agency," or "an employee or official of a governmental agency."  Moreover, the majority opinion impliedly concedes that none of the nouns listed in the definition of § 1 of Title 1 could be construed to include a "state or state agency" when it states that "the statute does not allow prosecution of a state or state agency."  Maj. Op. at 6.

The answers to the questions "What is an intangible right?", "What are honest services?," and what is "the intangible right of honest services" are not clear nor is their meaning readily available to the average citizen.  The term "intangible right" is not defined in the United States Code, is not defined in BLACK'S LAW DICTIONARY, and, prior to its use in § 1346, had never been used in any other statute of the United States.  The term "honest services" is not defined anywhere in the United States Code, is not defined in BLACK'S LAW DICTIONARY, and had never been used in the United States Code prior to its use in § 1346.  The phrase "the intangible right of honest services" is, therefore, inherently undefined and ambiguous.  There is no listing in the United States Code of all "intangible rights;" therefore, there is nothing which could be identified as "the intangible right of honest services."

35

It is therefore incomprehensible to us that the majority can conclude, as it must in order to uphold this conviction, that the inclusion of the words "[f]or the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services," reflects a clear statement of a Congressional intention to protect the citizenry of a state from corrupt state officials. Given this certain ambiguity of statutory words, there is surely no call for us to proceed further into legislative history to demonstrate that Congress has failed to satisfy the requirements delineated in *Bass* and *Ashcroft*. Nonetheless, the egregious error of the majority in applying this statute to the instant facts is emphasized by reference to legislative history. The legislative history demonstrates conclusively that the United States House of Representatives was unwilling to pass a criminal statute to reach the conduct alleged in the instant indictment.

## LEGISLATIVE HISTORY

The specific text of what has become 18 U.S.C. § 1346 was inserted in the Omnibus Drug Bill for the first time on the very day that the Omnibus Drug Bill was finally passed by both the House and the Senate.[4] The text of what is now § 1346 was never included

---

For an excellent discussion of the legislative history of § 1346, see Adam H. Kurland, *The Guarantee Clause as a Basis for Federal Prosecutions of State and Local Officials*, 62 S.

36

in any bill as filed in either the House of Representatives or the Senate. As a result, the text of § 1346 was never referred to any committee of either the House or the Senate, was never the subject of any committee report from either the House or the Senate, and was never the subject of any floor debate reported in the Congressional Record.

There are only two items of legislative history pertinent to the text of § 1346 as actually passed. First, there are remarks on the floor of the House entered by Representative Conyers regarding various provisions in the Omnibus Drug Bill, including the section of that bill which added the new § 1346 to Title 18. After describing the Supreme Court decision in *McNally* and its effect on various prior federal Circuit Court opinions, Representative Conyers stated:

> This amendment restores the mail fraud provision to where that provision was before the *McNally* decision. The amendment also applies to the wire fraud provision and precludes the *McNally* result with regard to that provision.

> The amendment adds a new section to 18 U.S.C. 63 that defines the term "scheme or artifice to defraud to include a scheme or artifice to defraud another of the intangible right of honest services." <u>Thus, it is no longer necessary to determine whether or not the scheme or artifice to defraud involved money or property</u>. This amendment is intended merely to overturn the *McNally* decision. <u>No other change in the law is intended</u>.

CAL. L. REV. 367, 487-91 (1989).

37

134 Cong. Rec. H11,108-01 (daily ed. Oct. 21, 1988) (emphasis added).

It is significant that in this statement Representative Conyers does not use the word "state," nor the words "citizens of a state," nor the words "state official," nor the words "public official," nor the words "state employee." What Representative Conyers does refer to as the change made by the amendment is that it eliminates the necessity "to determine whether or not the scheme or artifice to defraud involved money or property."[5]

Second, several weeks after the passage of the Omnibus Drug Bill, the Senate Judiciary Committee prepared and entered into the Congressional Record a report regarding all of the provisions in the Anti-Drug Abuse Act of 1988 which were within the jurisdiction of the Senate Judiciary Committee, for the purpose of detailing "Congress' intent in enacting these provisions." Regarding the text of what is now 18 U.S.C. § 1346, this report states as follows:

> Section 7603. Intangible Rights for Mail and Wire Fraud.
>
> This section overturns the decision of ***McNally v. United States*** in which the Supreme Court held

---

In the case of Representative Conyers' remarks, affording them any weight is dubious, as he voted against the final omnibus drug bill. *See* Geraldine Szott Moohr, Mail Fraud and the Intangible Rights Doctrine: Someone to Watch Over Us, 31 Harv. J. Leg. 153, 169 n.69 (1994). Likewise, there is nothing in the Congressional Record which identifies Representative Conyers as the sponsor of this amendment.

that the mail and wire fraud statutes protect property but not intangible rights. Under the amendment, those statutes will protect any person's intangible right to the honest services of another, including the right of the public to the honest services of public officials.[6] The intent is to reinstate all of the pre-*McNally* case law pertaining to the mail and wire fraud statutes without change.[7]

134 Cong. Rec. S17,360-02 (daily ed. Nov. 10, 1988) (footnotes added).

Such post-enactment legislative history, however, is not entitled to great weight. *See Consumer Products Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 (1980). Moreover, additional legislative history reveals that, on at least two occasions, Congress was unwilling to specifically enact a statute that expressly spoke to the conduct of public officials. The first such occasion was H.R. 3050, 100th Cong., 1st Sess., filed July 29, 1987, which provided for the addition of a new section in Chapter 63 of Title 18 of the United States Code, which would have read:

---

The phrase "including the right of the public to the honest services of public officials" in this report is pure conjecture at best. Surely the staff of the Senate Judiciary Committee knew that Section 2 of S2973 (public corruption) was rejected by the House of Representatives See our discussion of S2973 hereinafter.

The majority correctly notes that the pre-*McNally* case law was "uneven" and was "not a unified set of rules." Therefore, the federal statute could not have intended to "reinstate all of the pre-*McNally* case law." To do so would have required a truly extraordinary statute, in which the substantive force of the statute varied in each judicial circuit.

39

Section 1346.  Definition of Defraud for Certain Sections.

As used in Sections 1341 and 1343, the term "defraud" includes the defrauding of the citizens of a body politic --

1.  of their right to the conscientious, loyal, faithful, disinterested and unbiased performance of official duties by a public official thereof; or

2.  of their right to have the public business conducted honestly, impartially, free from bribery, corruption, bias, dishonesty, deceit, official misconduct and fraud.

This bill was referred to the House Committee on the Judiciary <u>but was never further acted upon in any way</u>.  Had this bill become law, Congress would have declared in clear and unmistakable language that the "citizens of a body politic" are protected by federal law from dishonest public servants.

Second, the most comprehensive vehicle by which Congress sought to change the *McNally* decision in a manner sufficient to satisfy the tests of *McNally* was Senate Bill 2793 (S2793), titled the "Anti-Corruption Act of 1988."  This bill was introduced in the Senate on September 7, 1988, referred to the Judiciary Committee, reported favorably by that committee without a report, and passed later by the Senate on October 14, 1988.  This bill was then sent to the House of Representatives, where it was referred to the House Judiciary Committee on October 19, 1988.  Concurrently with its passage by the Senate, S2793 was designated by a unanimous consent agreement of the Senate as one of a large number of amendments to

"comprise the joint leadership package" which would be attached as amendments to H.R. 5210, the Drug Initiative Act of 1988, Omnibus,[8] which was then before the Senate, having earlier been passed by the House.  H.R. 5210 (with S2793 included) was then passed by the Senate and sent back to the House.  On October 22, 1988, the House of Representatives reconsidered H.R. 5210 with the leadership package of amendments attached in the Senate and made various amendments thereto, and then passed the revised bill.  One of the amendments made by the House of Representatives was to delete the text of S2973 and substitute in its place the language which now appears codified as 18 U.S.C. § 1346.  H.R. 5210 as then amended was sent back to the Senate, which concurred in those amendments later on October 22, 1988.

Because of the direct relevance of S2973 to the text of what was ultimately passed as 18 U.S.C. § 1346, a copy of that bill is appended as an addendum to this dissent.  Section 2 of this bill (pages 1-6 of addendum) would have created a new Section 225, entitled "Public Corruption," to be inserted in Chapter 11 of Title 18 of the United States Code.  This new section would make criminal: (a) depriving or defrauding the inhabitants of a state or a political subdivision of a state of the honest services of an official or employee of such state or subdivision and (b) depriving

---

It should be noted that H.R. 5210 as previously passed by the House did _not_ contain any section dealing with the *McNally* decision nor the concept of "honest services."

41

or defrauding the inhabitants of a state or political subdivision of a state of a fair and impartially conducted election process in any primary, runoff, special or general election. On its face Section 2 of S2793 would have been a fairly comprehensive, articulate and clear attempt to define criminal conduct which would satisfy the requirements of *McNally* that the Congress speak "more clearly than it has" and, in the area of federal/state relations, that Congress clearly express its intent to affect such relations. If Section 2 of S2793 had been adopted by the House of Representatives, there would not now be any need for determining whether the word "another" means a "state or a political subdivision of a state." There is no report in the legislative history explaining why the House of Representatives declined to accept the full text of S2793 as part of the omnibus Anti-Drug Act of 1988 (H.R. 5210).

We may conclude from the demise of these more comprehensive bills (H.R. 3050 and S2793) that the House of Representatives was unwilling to join the Senate in the comprehensive definition of crime involving "public corruption" as set forth in Section 2 of S2793.

Section 3 of S2793, entitled "White Collar Crime," contemplated the addition of a new § 1346, entitled "Scheme or Artifice to Defraud," which would be added to Chapter 63 of Title 18 of the United States Code. It is apparent that Section 3 of

S2793 is a progenitor in some respects of the text of 18 U.S.C. § 1346, which was ultimately adopted by both Houses.  Change the word "organization" to "another" and put a period after the words "honest services," and one has the text of what was ultimately passed.

The legislative history likewise does not reveal any report or statement as to why the House of Representatives opted to make the changes it made in the portion of Section 3 of S2793 which the House of Representatives retained as Section 7603 of the Omnibus Crime Bill.  The word "organization" is defined in Section 18 of Title 18 as meaning "a person other than an individual."  The substitution of the pronoun "another" for the noun "organization" would work some enlargement of the class of potential victims, since the word "organization" by definition does not mean individual persons.  But the critical question to our inquiry here is whether simply by making this one word change the House intended to accomplish the same results that would have been accomplished if Section 2 of S2793 had also been adopted.  Simply to pose the question is to answer it.  If the House of Representatives truly agreed with the Senate that "depriving the inhabitants of a state or political subdivision of a state of the honest services of an official or employee of such state or subdivision" should become a federal crime when use was made of the mails or interstate wire, radio or television communications, then the clearest and most comprehensive way to do that (and satisfy the Supreme Court's tests

43

in *McNally*) would have been to adopt the entirety of Section 2 of S2793. The House of Representatives was unwilling to do that.[9]

Given this legislative history, the following conclusions must be drawn:

    1.    Both the House and the Senate certainly knew how to "speak clearly and definitively" on the subject of fraud depriving the citizens of a state or political subdivision of

---

A conclusion that the House of Representatives during the 100th Congress in 1988 was consciously unwilling to pass Section 2 of S2793 is corroborated by two other sources. First, the Public Integrity Section of the Department of Justice stated in its 1988 Report to Congress:

> Also, the Section pushed for and ultimately obtained congressional attention to the obstacle to effective corruption prosecution posed by the Supreme Court decision in *McNally v. United States*. That decision largely invalidated the use of the mail fraud statute to combat state and local corruption. Unfortunately, the legislation passed by Congress in 1988 did not completely address the problems posed by the *McNally* decision, and the Section will continue its efforts to see that this valuable weapon against corruption is restored. (Emphasis added).

Second, in subsequent Congresses, the Senate passed and included in its version of various crime bills provisions almost verbatim the same as the provisions of Section 2 of S2793. *See* 135 Cong. Rec. S12,430-32 (daily ed. Oct. 3, 1989) (statement of Sen. Biden); 136 Cong. Rec. S6638-39 (daily ed. May 21, 1990) (statement of Sen. Biden); 137 Cong. Rec. S9382-83 (daily ed. July 9, 1991); 138 Cong. Rec. S6911-03 (daily ed. May 19, 1992). But none of these bills passed by the Senate were ever adopted by the House of Representatives.

44

the intangible right of good and honest government, but the House refused to do so; and

2. None of the bills containing any such express provisions received a majority vote of both houses of Congress. Instead, what was passed by both houses of Congress was a last minute, "bobtailed" compromise which had never been the subject of hearings in either house.

The wording of § 1346 simply does not effect a change in the portion of the *McNally* opinion which held that the mail fraud statute does not reach "schemes to defraud citizens of their intangible rights to honest and impartial government." The legislative history reinforces this view.

## SECTION 1346 FAILS TO GIVE NOTICE

The majority opinion seems to make the test of "speaking more clearly" simply Congress' evidencing an intention to overrule *McNally*. But overruling *McNally* does nothing to place in the statutory language the necessary words, phrases and language which would notify the average citizen that these statutes have been dramatically extended to include conduct and activities not previously stated therein. Clearly, when the Supreme Court decided *McNally*, all of the preexisting Circuit Court constructions, interpretations and applications went down the drain; the convictions of many defendants who had been prosecuted under the

45

pre-*McNally* law had to be vacated, and conduct occurring prior to the effective date of § 1346 could no longer be prosecuted under the old law.

*McNally* placed the burden on Congress to put down in statutory form whatever expanded scope it chose to give to the fraud statutes. In effect, Congress was charged with codifying in statutory form the definitions of the conduct which would be prohibited by the concepts of "intangible rights," "honest services," and "good and honest government," and to expressly indicate whether Congress intended to extend these concepts to the conduct of state officials. The requirement imposed by the Supreme Court to speak more clearly was not for the benefit of the Circuit Courts which had, in fact, given birth to these concepts in the first place. Rather, the requirement to speak more clearly, in addition to addressing federalism concerns, was for the benefit of the public, the average citizen, the average mid-level state administrator like Brumley, who must be forewarned and given notice that certain conduct may subject him to federal prosecution. The staff of the Senate Judiciary Committee and the Department of Justice clearly understood these requirements and drafted S2793 (see addendum) which would satisfy them. This bill passed the Senate, but the House was unwilling to specifically regulate the conduct of state officials. In its place, the House substituted a one-sentence statement that did not define the word "another," did

46

not define the term "intangible right," and did not define the term "honest services."  It is difficult to understand how the majority can conclude that the statutory language of § 1346 "plainly reaches state officials such as Brumley."

## HONEST SERVICES

Finally, we have to register our disagreement with the fundamental premise upon which the majority opinion seems to be based, i.e., that Congress can delegate to the federal courts the task of defining the key terms and coverage of a criminal statute. We have found no Supreme Court case which supports that proposition, and the majority opinion cites no authority, either constitutional, statutory or decisional, for that premise.  The majority pays lip service to the principle that Congress must define the criminal conduct when it states:

> We will not lightly infer that Congress intended to leave to courts and prosecutors, in the first instance, the power to define the range and quality of services a state employer may choose to demand of its employees.

Maj. Op. at 10.  Surprisingly, the majority flatly contradicts itself when it states that the passage of § 1346 has set the Courts "back on a course of defining honest services, and we turn to that task." As stated earlier, research indicates that the term "honest services" has never been used by the United States Congress in any statute prior to its use in § 1346, and that the term is nowhere

47

defined by Congress. Likewise, there is nothing in the words of the statute itself nor in any of the legislative history of § 1346 which would indicate any Congressional intent to delegate to the Courts the task of defining the words "honest services," even if Congress could constitutionally do so.

The majority's attempt to define "honest services" demonstrates why such ad hoc definitions cannot possibly satisfy the requirements of "fair notice" to our fellow citizens as to where the line between permitted and prohibited conduct is drawn. On the one hand, the majority says that "the statute contemplates that there must first be a breach of a state owed duty," but on the other hand, it states that "the mere violation of a gratuity statute, even one closer to bribery than the Texas statute, will not suffice." Likewise, at one point the majority states that "we do not reach the question of whether a breach of duty to perform must violate the criminal law of the state," but in another point the majority supports its evidentiary analysis by saying that "Brumley violated a Texas criminal statute." Finally, at two points the majority recognizes that the case law on "honest services" prior to *McNally* was "not a unified set of rules" and was "uneven." From its review of the pre-*McNally* cases, the majority found "two uncertainties regarding the draw by this federal statute upon state law, specifically in defining the statutory element of honest services." Maj. Op. at 10. It is obvious, therefore, that

48

the majority has recognized that the term "honest services" has not achieved the status of a commonly accepted and recognized term of art which Congress could have been relying upon in using these words. The majority makes a labored effort to infuse some sort of meaning to these words; but in truth and in fact, the majority finds that meaning in its own subjective notions and not in the words of Congress.

## CONCLUSION

Because our colleagues in the majority (1) have closed their eyes to obvious ambiguities in the text of 28 U.S.C. § 1346; (2) have chosen to completely ignore and avoid the legislative history of § 1346 which that undermines the majority's conclusion; (3) have concluded, without analysis or reference to any principles of statutory construction, that § 1346 "plainly reaches state officials such as Brumley;" and (4) now legislate the definition of honest services, we find ourselves in total and fundamental disagreement with the majority opinion. We therefore respectfully dissent.

49